# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FdG LOGISTICS LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 9706-CB |
| | ) | |
| A&R LOGISTICS HOLDINGS, INC., | ) | |
| | ) | |
| Defendant/Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FdG ASSOCIATES LP, DAVID S. GELLMAN, JAMES E. BEDEKER, CYNTHIA M. BRANKIN, STEVEN R. BRANTLEY, NORMAN C. BUCK, JOHN P. CISZEK, ROBERT N. DOTSON, PAUL GARBER, MICHAEL J. HOGAN, JEREMY K. LOHRENS, ANDREW J. MANTEY, JEFFREY J. O'CONNOR, BRIAN R. REICHERT, LEEANNE RICE, STEPHEN W. ROBINSON, PAUL D. SWEEDEN, and RICHARD THOMPSON, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Additional Counterclaim Defendants. | ) ) | |

## OPINION

Date Submitted: November 16, 2015
Date Decided: February 23, 2016

David J. Margules and Evan W. Krick, BALLARD SPAHR LLP, Wilmington, Delaware; Julian W. Friedman, BALLARD SPAHR LLP, New York, New York; Philip J. Kessler, Joseph Aviv, Bruce L. Segal, Jennifer Zbytowski Belveal, and B. Michael Ortwein III, HONIGMAN MILLER SCHWARTZ AND COHN LLP, Detroit, Michigan; *Counsel for Plaintiff/Counterclaim Defendant FdG Logistics LLC and Counterclaim-Defendants FdG Associates LP and David S. Gellman.*

Philip Trainer, Jr. and Toni-Ann Platia, ASHBY & GEDDES, P.A., Wilmington, Delaware; *Counsel for Counterclaim-Defendants James E. Bedeker, Cynthia M. Brankin, Norman C. Buck, John P. Ciszek, Robert N. Dotson, Paul Garber and Paul D. Sweeden*; Patrick T. Brankin, SCHAIN, BANKS, KENNY & SCHWARTZ, LTD., Chicago, Illinois; *Co-Counsel for Counterclaim Defendants James E. Bedeker and Cynthia M. Brankin*.

C. Barr Flinn and Tammy L. Mercer, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Robert A. Chapman and Shannon T. Knight, CHAPMAN SPINGOLA, LLP, Chicago, Illinois; *Counsel for Counterclaim Defendants Jeffrey J. O'Connor and Brian R. Reichert*.

Michael F. Bonkowski and Nicholas J. Brannick, COLE SCHOTZ PC, Wilmington, Delaware; Vance L. Liebman, Damon E. Dunn and Neil M. Rosenbaum, FUNKHOUSER VEGOSEN LIEBMAN & DUNN LTD., Chicago, Illinois; *Counsel for Counterclaim Defendant Andrew J. Mantey*.

Peter B. Ladig, Patricia A. Winston and Elizabeth A. Powers, MORRIS JAMES LLP, Wilmington, Delaware; *Counsel for Counterclaim Defendants Steven R. Brantley, Michael J. Hogan, Jeremy Lohrens and Stephen W. Robinson.*

Henry E. Gallagher, Jr. and Ryan P. Newell, CONNOLLY GALLAGHER LLP, Wilmington, Delaware; David K. Herzog and James P. Hanlon, FAEGRE BAKER DANIELS LLP, Indianapolis, Indiana; *Counsel for Defendant/Counterclaimant A&R Logistics Holdings Inc*.

**BOUCHARD, C.**

This action arises out of a private equity firm's 2012 purchase of a trucking company now owned by A&R Logistics Holdings, Inc. ("A&R" or the "Buyer') through a merger transaction. FdG Logistics LLC ("FdG Logistics") initiated this action as the representative of the selling securityholders (the "Securityholders") to recover a pre-closing tax refund. In response, Buyer asserted counterclaims for indemnification, violation of the Delaware Securities Act, common law fraud, and unilateral mistake. This opinion resolves the Securityholders' motion to dismiss certain parts of the counterclaim, and FdG Logistics' motion for summary judgment concerning the tax refund.

The Securityholders seek to dismiss Buyer's common law fraud claim insofar as that claim asserts fraud based on extra-contractual statements made to Buyer before it entered the merger agreement. This aspect of the Securityholders' motion is denied because the merger agreement does not contain an affirmative disclaimer of reliance by *Buyer* sufficient to preclude it from asserting a claim for fraud based on representations outside the four corners of the merger agreement under this Court's precedents.

Buyer's claim under the Delaware Securities Act fails to state a claim for relief because Buyer has not established the requisite factual nexus between the challenged merger and Delaware to trigger application of the Act. Given the absence of such a nexus, Buyer makes the novel argument that the parties to the merger agreement made the Delaware Securities Act apply automatically by including in the merger agreement a Delaware choice of law provision stating that the merger agreement "will be governed by and construed in accordance with the laws of the State of Delaware." I conclude that Buyer's interpretation of the choice of law provision is not a reasonable construction.

Among other things, such an interpretation would lead to the bizarre result of converting a blue-sky statute that the Legislature intended to regulate *intrastate* securities transactions into one that would regulate *interstate* securities transactions.

Buyer's claim of unilateral mistake also fails to state a claim for relief because it would not be unconscionable to enforce the merger agreement, which was the product of arm's-length negotiations between sophisticated parties. This count also fails to state a claim because it would not be possible in my view to return the parties to the status quo through rescission of the merger more than three years after it closed.

Finally, I grant FdG Logistics' motion for summary judgment concerning the tax refund claim based on the undisputed facts of record and the plain language of the merger agreement, which expressly states that pre-closing tax refunds are the "property" of the Securityholders and are to be paid to their representative "promptly" after receipt.

## I. BACKGROUND

The facts for purposes of the Securityholders' motion to dismiss come from A&R's Verified Amended Counterclaim dated April 10, 2015 (the "Counterclaim"), documents incorporated therein, or facts of which the Court may take judicial notice. Because the issues left for decision on the motion to dismiss are fairly discrete, only a general summary of the factual background of this case is necessary.[1]

---

[1] The Securityholders also moved to dismiss Buyer's common law fraud claim under Court of Chancery Rule 9(b) for failure to plead fraud with particularity. I summarily denied that aspect of their motion during the hearing held on November 16, 2015, because both parties injected numerous documents (over 100 in total) outside the pleadings in briefing that issue, making it impossible as a practical matter to resolve the Rule 9(b) issues on a motion to dismiss. *See* Tr. of Oral Arg. 7-9 (Nov. 16, 2015).

The facts relevant to FdG Logistics' motion for summary judgment are limited in number and admitted in A&R's Amended Answer dated April 10, 2015 (the "Answer").

## A. The Parties

A&R Logistics Holdings, Inc. is a Delaware corporation headquartered in Louisville, Kentucky. It is the holding company for A&R Logistics, Inc., a trucking company located in the Midwest (the "Trucking Company"). A&R is a leading provider of dry bulk transportation and logistics solutions serving the plastics, chemical, and food industries in North America. It owns and operates a network of approximately twenty-five terminals and warehouses across the United States.

A&R was the surviving corporation following a merger with A&R Merger Corp., a subsidiary of Mason Wells, a private equity firm based in Milwaukee, Wisconsin. In this opinion, I refer to A&R as it existed before the merger as "Old A&R," and I refer to the surviving entity as "A&R" or "Buyer."

FdG Associates LP ("FdG Associates") is a Delaware limited partnership headquartered in New York, New York. FdG Logistics, LLC, a Delaware limited liability company, was the primary vehicle through which FdG Associates held its ownership interest in Old A&R.[2] As of the date of the merger, that ownership interest amounted to approximately 62.15% of Old A&R's stock. Most if not all of the remaining shares of Old A&R were owned by individuals who were made parties to this case in response to A&R's Counterclaim.

---

[2] FdG Associates actually held its ownership stake in Old A&R through a series of shell companies. Counterclaim ¶ 11. Those entities are not relevant to the present motions.

3

In its Counterclaim, A&R asserts claims against FdG Associates, FdG Logistics, and eighteen individuals. One of these individuals, David S. Gellman, is the founder and a manager of FdG Associates. Gellman also was a director and a Vice President and Secretary of Old A&R. The other seventeen individuals held stock or options in Old A&R before the merger, and served in one or more capacities as a director, officer or employee of Old A&R. For simplicity, I use the term "Securityholders" to refer collectively to FdG Associates, FdG Logistics, and the eighteen individuals named as counterclaim defendants.[3]

A&R Merger Corp., Old A&R, FdG Logistics (as the Securityholders' Representative), and certain of the Securityholders are parties to an Agreement and Plan of Merger dated as of December 18, 2012 (the "Merger Agreement").

B. **The History of Old A&R**

James E. Bedeker founded Old A&R in 1969. Bedeker began his career as a truck driver and started his company with three trucks. Over several decades, Bedeker expanded Old A&R's operations, acquiring additional facilities and trucks and targeting the dry-bulk transportation market. During Bedeker's tenure, Old A&R became one of the largest dry-bulk carriers operating in North America.

Around 2007, FdG Associates invested in Old A&R, recapitalizing it through a purchase of over 60% of its equity from Bedeker. FdG Associates created FdG Logistics

---

[3] In doing so, I recognize that no allegation is made that Gellman personally held any stock or options in Old A&R, and it appears that FdG Associates' interest in Old A&R was held through FdG Logistics, but these details are not important for purposes of this decision.

4

to hold its investment in Old A&R.  FdG Associates was an active manager of Old A&R, and several of its employees are alleged to have worked closely with Old A&R from 2007 to 2012.  More specifically, Buyer alleges that FdG Associates exerted control and domination over Old A&R, dictating how Old A&R was to operate and imposing various initiatives at the company, including cost-saving and cost-cutting programs, frequently without Old A&R management's consent, feedback, or input.

### C.    The Sale Process

During the summer of 2012, Old A&R's board solicited interest to sell Old A&R through an auction process with the assistance of Harris Williams & Co., an investment bank, and BB&T Capital Markets, a financial advisor.  In connection with this process, a 73-page confidential information memorandum was prepared in July 2012 to tell Old A&R's story and generate interest in the market.  It touted Old A&R's market leadership in dry-bulk transportation, stating that Old A&R had the "highest quality fleet of specialized trucks, trailers, and other equipment in the industry."[4]

On September 13, 2012, representatives of Buyer met with Old A&R's senior management team at the company's headquarters.  During the meeting, they received a 38-slide PowerPoint presentation from management.  This presentation touted Old A&R's "high-quality, specialized fleet of trucks, trailers, and other equipment," and

---

[4] Counterclaim ¶ 478.

5

emphasized that "A&R's optimized network, specialized equipment, and 'can do' culture provide customers with exceptional service."[5]

On October 12, 2012, representatives of Buyer submitted a letter outlining the basic terms of a proposed acquisition of Old A&R, including a transaction price, and requesting acknowledgement and agreement to the terms from Old A&R and FdG Logistics. On October 14, 2012, Gellman signed Buyer's letter of intent on behalf of both Old A&R and FdG Logistics. The parties then entered into a period of exclusivity, during which Buyer conducted due diligence, additional information was made available to Buyer, and the parties negotiated the terms of a deal.

In connection with the sale process, an online data room was established to house certain information about Old A&R. Although the data room had been made available to all prospective bidders during the sale process, including Buyer, additional information was made available to Buyer via the data room after the exclusivity period began.

A key component of the parties' negotiations involved the preparation of more than 80 pages of disclosure schedules that form the factual basis for various representations and warranties in the Merger Agreement. On October 31, 2012, Jeffrey J. O'Connor, President and Chief Executive Officer of Old A&R, began work on the disclosure schedules and the representations and warranties. In an email he sent to certain members of management that day, O'Connor emphasized the importance of

---

[5] *Id.* ¶¶ 488-89.

reviewing these provisions carefully. Old A&R management met numerous times over the following weeks to discuss the disclosure schedules.

On December 17, 2012, the day before the Merger Agreement was signed, O'Connor emailed a revised draft of the disclosure schedules to eight individuals, which included Old A&R's founder (Bedeker) and senior members of its management, stating: "If anyone has any additional items for the disclosure statements based on our conversation yesterday I need to know them now. Thanks and please advise….ASAP."[6] O'Connor and these eight individuals[7] each signed "Knowledge Certificates," in which they certified to Old A&R that:

> I have carefully reviewed the representations and warranties and schedules to the Agreement and Plan of Merger dated as of December __, 2012, by and among A&R Merger Corp., A&R Logistics Holdings, Inc., FdG Logistics LLC and the Securityholders named therein (the "Merger Agreement"), and I have reviewed such representations and warranties with all of the applicable direct reports listed on Schedule 1 of the Merger Agreement (such person, the "Direct Reports").
>
> To the best of my knowledge, after reviewing the representations and warranties in the Merger Agreement with the Direct Reports, as modified by the schedules, such representations and warranties are true, correct, and complete and do not omit to state anything, the omission of which could make the Representations misleading.[8]

---

[6] Counterclaim ¶¶ 532-33.

[7] The eight individuals who signed Knowledge Certificates in addition to O'Connor were Brian R. Reichert, Chief Financial Officer; Andrew J. Mantey, Chief Operating Officer of the Transportation Division; Robert N. Dotson, Chief Operating Officer of the Packaging & Distribution Division; John P. Ciszek, Chief Operating Officer of the Global Logistics Division; Paul D. Sweeden, Senior Vice President of Sales and Marketing; Michael J. Hogan, Vice President of Sales and Marketing; Jeremy J. Lohrens, Controller; and James E. Bedeker, Chairman of the Board.

[8] Counterclaim ¶ 534.

**D.     The Merger Agreement**

On December 18, 2012, A&R Merger Corp. (as Buyer) entered into the Merger Agreement with Old A&R and two of the Securityholders:  FdG Logistics and Bedeker, which held approximately 62.15% and 19.24% of Old A&R's stock, respectively.  The Merger Agreement designated FdG Logistics as the "Securityholders' Representative." The merger closed on December 18, the same day the Merger Agreement was signed.

Under the Merger Agreement, each share of each class of Old A&R's capital stock the Securityholders owned immediately before the closing was canceled and extinguished and converted into the right to receive a cash payment, as well as a pro rata share of any amounts delivered to FdG Logistics under the Merger Agreement for disbursement to the Securityholders.  As a condition of receiving their share of the merger consideration,[9] each of the Securityholders who did not sign the Merger Agreement was required to sign a Letter of Transmittal acknowledging their indemnification obligations under the Merger Agreement.

In Article 5 of the Merger Agreement, Old A&R made a series of representations and warranties with respect to Old A&R and each of its subsidiaries, including the Trucking Company.  The last provision of Article 5 (Section 5.27), which is quoted in full and discussed later in this opinion, states in uppercase letters that Old A&R makes no representations or warranties except as expressly set forth in Article 5.

---

[9] The total amount of the merger consideration was the "(i) Enterprise Value [$203 million], minus (ii) the Closing Company Group Indebtedness, plus (iii) the Working Capital Adjustment, minus (iv) the amount of Transaction Expenses that are unpaid immediately prior to the Closing."  Merger Agreement § 1.1 at 13.

8

Section 9.2(A) of the Merger Agreement provides that each of the Securityholders, severally but not jointly, will indemnify A&R for certain losses it may incur for any inaccuracy in or breach by Old A&R of any representations or warranties made set forth in the Merger Agreement, including those set forth in Article 5. Subject to certain exceptions, the Securityholders's indemnification obligations are not triggered until the losses exceed $1 million and are subject to a cap of $20.3 million, but these limitations do not apply in cases of "fraud or intentional breach."[10] Section 9.4(F) provides, with certain exceptions, that the indemnification rights set forth in Article 9 shall be the parties' "sole and exclusive remedies with respect to any and all claims (other than claims for fraud or intentional breach) relating to the subject matter" of the Merger Agreement.

The Merger Agreement also contains several provisions relating to how A&R, as the surviving company, would treat tax refunds for pre-closing periods received after the closing. Section 9.6(B) of the Merger Agreement requires the surviving corporation to "prepare and cause to be timely filed, all Tax Returns of any member of the Company Group that are due after the Closing Date for any period ending on or before the Closing Date." Section 9.6(B) further provides procedures by which FdG Logistics, as the Securityholders' Representative, shall review and comment on any such tax returns before filing. Section 9.6(E) of the Merger Agreement acknowledges that tax refunds for pre-closing tax periods are the "property" of the Securityholders and are to be paid to them "promptly" after receipt:

---

[10] Merger Agreement § 9.2(A).

9

All refunds of Taxes (whether in the form of a direct payment or as a credit or other offset against other Taxes payable) for Pre-Closing Tax Periods (to the extent not included in Closing Net Working Capital as finally determined) shall be property of the Securityholders in accordance with their Pro Rata Share. To the extent that any member of the Company Group receives a refund that is property of Securityholders (whether as a direct payment or as a credit or other offset against other Taxes payable), the Surviving Corporation shall promptly pay, or cause the Company Group promptly to pay, the amount of such refund (plus related interest received by the Company Group) to the Securityholders' Representative on their behalf.[11]

### E. Buyer Asserts Indemnification Claims and Alleges that Illegal and Fraudulent Practices at Old A&R Were Concealed from It

Less than six months after the merger closed on December 18, 2012, Buyer began sending a series of notices of claims for indemnification to FdG Logistics, for itself and as the Securityholders' Representative. Buyer sent at least twelve indemnification notices.[12] The Securityholders dispute these indemnification claims.

In this action, Buyer more broadly asserts that it discovered after the merger closed that Old A&R had engaged in an extensive series of illegal and improper activities that were concealed from it during pre-merger due diligence before Buyer entered the Merger Agreement. Examples of these alleged activities include the following:

- The Trucking Company's drivers systematically falsified their hours-of-service logs, in violation of federal regulations, to increase their daily miles driven by 30-40%.

---

[11] Merger Agreement § 9.6(E).

[12] Specifically, Buyer sent notices on May 10, 2013, May 17, 2013, May 25, 2013, June 3, 2013, October 24, 2013, December 24, 2013, March 21, 2014, May 5, 2014, May 16, 2014, June 17, 2014, June 18, 2014, and October 7, 2014. Counterclaim Exs. 3-14.

10

- The Trucking Company intentionally manipulated its drivers' scale tickets and time stamps.

- The Trucking Company's tank wash facility in Joliet, Illinois discharged industrial wastewater in violation of environmental laws.

- FdG Logistics directed a massive operation to cut truck maintenance costs by nearly half before the merger, which caused personnel to falsely report regular maintenance as capital expenditures to avoid budget caps in order to keep the trucks running.

- The Trucking Company systematically created fake "wash tickets" indicating that its trucks had been properly cleaned before hauling sensitive loads and fraudulently charged customers for these never-performed services.

- Two of the Trucking Company's facilities were badly impaired structurally, requiring over $2 million in repair costs for each.

- The Trucking Company hired aliens who were not authorized to work in the United States.

F.    **A&R Files for, and Receives, the 2012 Tax Refund**

A&R received extensions of time to file its 2012 federal and state tax returns. On August 22, 2013, after receiving copies of the 2012 federal and state tax returns, FdG Logistics provided comments on them. A&R later filed the 2012 federal and state tax returns, which relate to pre-closing tax periods. At some point before April 10, 2015,

11

when it amended its answer in this action, Buyer received refunds with respect to the 2012 federal and state tax returns totaling $2,080,650 (the "2012 Tax Refund").

## G. Procedural History

On May 28, 2014, FdG Logistics filed a complaint asserting a single claim for breach of the Merger Agreement for failing to remit the 2012 Tax Refund to the Securityholders' Representative. On October 7, 2014, A&R filed its initial answer and counterclaim, which it amended on April 10, 2015. As amended, the Counterclaim, which covers 596 paragraphs, asserts four claims based on the allegedly illegal and improper activities summarized above. Count I asserts a claim for indemnification for alleged inaccuracies in and breaches of numerous representations and warranties in the Merger Agreement. Counts II and III assert claims for fraud under the Delaware Securities Act and the common law, respectively. Count IV asserts a claim for rescission based on an alleged unilateral mistake.

On May 29, 2015, FdG Logistics moved for summary judgment on its 2012 Tax Refund claim. On July 10, 2015, the Securityholders moved to dismiss Counts II, III and IV of the Counterclaim.[13]

---

[13] One individual defendant (Andrew J. Mantey) also moved to dismiss the indemnification claim in Count I under Court of Chancery Rules 8(a) and (e) for failure to state a "short and plain" claim for indemnification because of, in essence, the length of the Counterclaim, which spans 174 pages and contains 596 paragraphs. This argument is rejected. Although brevity in pleadings is admirable, the length of the Counterclaim is largely due to the need to satisfy the particularity requirements of Rule 9(b) for purposes of the fraud claims A&R has asserted in Counts II and III. Mantey, moreover, provides no analysis to explain why any of the specific grounds for indemnification recited in the Buyer's indemnification notices, which are attached to the Counterclaim and incorporated into Count I, fail to state a claim for relief. *See* Counterclaim ¶ 578.

## II. LEGAL ANALYSIS

This opinion first addresses the motions to dismiss Counts II, III and IV of the Counterclaim and then addresses FdG Logistics' motion for summary judgment.

### A. The Securityholders' Motions to Dismiss

Under Court of Chancery Rule 12(b)(6), a motion to dismiss for failure to state a claim must be denied "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[14] "In determining whether a pleading meets this minimal standard, this Court draws all reasonable inferences in the plaintiff's favor, accepts all well-pleaded factual allegations as true, and even accepts 'vague allegations in the Complaint as 'well pleaded' if they provide the defendant notice of the claim.'"[15]

#### 1. Count II of the Counterclaim Fails to State a Claim for Violation of the Delaware Securities Act

In Count II of its Counterclaim, A&R asserts that the Securityholders' statements and omissions during the sale process and in the Merger Agreement violated the Delaware Securities Act, which imposes liability on anyone who "[o]ffers, sells or purchases a security by means of any untrue statement of a material fact."[16] The Securityholders contend that Count II fails to state a claim for relief because the

---

[14] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011); *see also Winshall v. Viacom Int'l., Inc.*, 76 A.3d 808, 813 n.12 (Del. 2013).

[15] *Seinfeld v. Slager*, 2012 WL 2501105, at *2 (Del. Ch. June 29, 2012) (quoting *Cent. Mortg. Co.*, 27 A.3d at 536)).

[16] 6 *Del. C.* § 73-605(a)(2).

13

transaction at issue lacks a sufficient nexus to Delaware to trigger application of the Delaware Securities Act.[17] I agree with the Securityholders.

Enacted in 1973, the Delaware Securities Act is Delaware's "blue-sky" law. This term generally refers to state legislation regulating the sale of securities.[18] The primary purpose of the Delaware Securities Act is "to provide a basis for stopping intrastate securities fraud."[19]

In *Singer v. Magnavox Co.*, which appears to be the first case construing the Delaware Securities Act, the Delaware Supreme Court noted that there is "a presumption that a law is not intended to apply outside the territorial jurisdiction of the State in which

---

[17] Defendants also contend that the Delaware Securities Act does not apply to merger transactions. *See* 6 *Del. C.* § 73-103(a)(17)(d) (excluding from definition of "sale" or "sell" "any act incident to a vote by stockholders . . . pursuant to the certificate of incorporation, or the provisions of Title 8, on a merger . . . in consideration of the issuance of securities of the same or another corporation."). A&R disagrees on the theory that the Act only exempts stock-for-stock mergers. Because I conclude that Count II fails to state a claim for relief for lack of a sufficient nexus to Delaware to trigger application of the Delaware Securities Act, I do not address this issue.

[18] *See generally* Paul G. Mahoney, *The Origins of the Blue-Sky Laws: A Test of Competing Hypotheses*, 46 J.L. & Econ. 229 (2003); *see also id.* 229 (Noting that such laws "are known as 'blue-sky' laws, purportedly because one of their supporters claimed that many securities salesmen were so dishonest that they would sell 'building lots in the blue sky.'") (citing Louis Loss & Edward M. Cowett, *Blue Sky Law* 7 n.22 (1958)).

[19] 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 17.7[A], at 17-43 (3d ed. Supp. 2014). *See also* 6 *Del. C.* § 73-101(b) ("The purpose of the Delaware Securities Act is to prevent the public from being victimized by unscrupulous or overreaching broker-dealers, investment advisers and other agents in the context of selling securities or giving investment advice, as well as to remedy any harm caused by securities law violations.")

it is enacted" and specifically held that the Act does not apply to a Delaware corporation simply by virtue of the act of incorporating in Delaware:

> [W]e read the Securities Act as a Blue Sky Law governing transactions which are subject to Delaware jurisdiction under traditional tests. To state it another way, we do not read the Act as an attempt to introduce Delaware commercial law into the internal affairs of corporations merely because they are chartered here. Of course, a Delaware corporation is bound by the Act, if it is otherwise applicable. But it is not bound simply because the company is incorporated here.[20]

*Singer* involved a stockholder challenge to the merger of a Delaware corporation. The plaintiff stockholders were residents of Pennsylvania. They were not solicited in Delaware, and there was no indication that the merger agreement was negotiated in Delaware or that any part of the alleged "sale" of their securities occurred in Delaware.[21] From this record, the Supreme Court concluded that "[i]t follows that the Delaware Securities Act does not apply."[22] Applying *Singer*, this Court has held that the Delaware Securities Act "only applies where there is a sufficient nexus between Delaware and the transaction at issue."[23]

---

[20] 380 A.2d 969, 981 (Del. 1977), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983).

[21] *Id.*

[22] *Id.*

[23] *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *19 (Del. Ch. Dec. 1, 2009); *Eurofins Panlabs, Inc. v. Ricerca Biosciences, LLC,* 2014 WL 2457515, at *18 (Del. Ch. May 30, 2014) (same); *see also Dofflemyer v. W.F. Hall Printing Co.*, 558 F. Supp. 372, 377 (D. Del. 1983) (Delaware Securities Act did not apply because "[t]he parties have not suggested any connection between the events challenged . . . and the State of Delaware, other than the fact that the defendant corporations are incorporated" in Delaware). The Uniform Securities Act, upon which the Delaware Securities Act is based, is also understood to generally enforce such a nexus requirement. *See* 12 Joseph

This Court recently confirmed the need to demonstrate a nexus to Delaware to trigger application of the Delaware Securities Act in *Eurofins Panlabs, Inc. v. Ricerca Biosciences, LLC.*[24] In that case, a buyer of a business argued that the Act applied to the transaction based on a contractual choice of law provision stating that "all disputes [ ] be resolved according to Delaware law in the Delaware Court of Chancery."[25] In a brief footnote, the Court held that "[c]ertainly, an analysis of whether the Delaware Securities Act applies is an application of Delaware law and therefore complies with the choice of law provision."[26] The Court then analyzed whether the buyer had pled sufficient facts in its complaint to establish the requisite nexus to trigger application of the Delaware Securities Act. Finding that the buyer had not, the Court dismissed its Delaware Securities Act claim. The implied rationale of the Court's approach in *Eurofins* is that, if one assumes that a generic Delaware choice of law provision encompassed the Delaware Securities Act, it is reasonable to assume that the parties (at least absent expressing a contrary intent) intended to incorporate the Act "as is," which would include the jurisdictional limitations inherent in the Act.

---

C. Long, *Blue Sky Law* § 4:2 (2015) ("the drafters of the Uniform Act consciously rejected citizenship or residence within a particular state as the policy base for application of the Uniform Act. Instead, they elected a territorial base, requiring that a transaction have some physical nexus with a state.")

[24] 2014 WL 2457515, at *18 (Del. Ch. May 30, 2014).

[25] *Id.* at *18 n.136.

[26] *Id.*

Here, A&R does not attempt to identify any of the type of facts one would typically consider in determining whether the requisite nexus exists to trigger the application of a Blue Sky Law. A&R does not assert, for example, that it was solicited to purchase the securities of Old A&R in Delaware, or that any of the negotiations over the Merger Agreement occurred in Delaware. Instead, similar to the plaintiff in *Eurofins*, A&R argues that the Delaware Securities Act applies because of the choice of law provision in the Merger Agreement. That provision states that "[a]ll issues concerning the Transaction Documents . . . will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule . . . that would cause the application of the law of any jurisdiction other than the State of Delaware."[27] In an effort to distinguish the summary rejection of this argument in *Eurofins*, A&R invokes 6 *Del. C.* § 2708, which the Court in *Eurofins* did not consider.

Section 2708 was adopted in 1993, twenty years after the Delaware Securities Act became law. It provides, in relevant part, that:

> The parties to any contract, agreement or other undertaking . . . may agree in writing that the contract, agreement or other undertaking shall be governed by or construed under the laws of this State, without regard to principles of conflict of laws . . . if the parties, either as provided by law or in the manner specified in such writing are, (i) subject to the jurisdiction of the court of, or arbitration in, Delaware and (ii) may be served with legal process. The foregoing shall conclusively be presumed to be a significant,

---

[27] Merger Agreement § 10.9. The term "Transaction Documents" includes the Merger Agreement. *Id.* § 1.1 at 15.

17

material and reasonable relationship with this State and shall be enforced whether or not there are other relationships with this state.[28]

Section 2708 only applies to contracts involving $100,000 or more.[29] Before Section 2708 was enacted, a Delaware court ordinarily would have analyzed a parties' contractual choice of law under the Restatement (Second) of Conflict of Laws, enforcing the parties' choice unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.[30]

Using similar language as the Restatement, Section 2708 essentially stipulates that for purposes of deciding whether to apply a Delaware choice of law provision, courts may assume a negative answer to both of these exceptions.[31]

At its core, Section 2708 is intended to provide certainty to parties who are subject to jurisdiction in Delaware that their choice of Delaware law regarding the construction and enforceability of their contracts will be respected. That is the conclusion then-Vice Chancellor Strine reached in *Abry Partners V, L.P. v. F & W Acquisition LLC*,[32] in

---

[28] 6 *Del. C.* § 2708(a).

[29] *Id.* § 2708(c)(2).

[30] Restatement (Second) of Conflict of Laws § 187(2).

[31] *See* Larry E. Ribstein, *Delaware, Lawyers and Contractual Choice of Law*, 19 Del. J. Corp. L. 999, 1004.

[32] 891 A.2d 1032 (Del. Ch. 2006).

construing a choice of law provision similar to the one at issue here[33] to encompass not only the contract law of Delaware to interpret the contract, but also Delaware's tort law for purposes of determining the enforceability of the contract:

> Parties operating in interstate and international commerce seek, by a choice of law provision, certainty as to the rules that govern their relationship. To hold that their choice is only effective as to the determination of the contract claims, but not as to tort claims seeking to rescind the contract on grounds of misrepresentation, would create an uncertainty of precisely the kind that the parties' choice of law provision sought to avoid.
>
> * * * * *
>
> When parties have chosen a state's contract law to govern their contract, it is illogical to assume that they wished to have the enforceability of that contract judged by another state's law. Section 2708 of Title 6 of the Delaware Code represents our General Assembly's intent to prevent perverse dichotomies in the linguistics used to determine the meaning and enforceability of contracts. When satisfied, as here, § 2708 also establishes that this State has a material relationship sufficient to satisfy § 187 of the Restatement (Second) of Conflict of Laws.[34]
>
> Consistent with the Court's analysis in *Abry* and other cases applying the statute,[35]

I view Section 2708 as intending to permit contracting parties to incorporate the law of

---

[33] The choice of law provision in *Abry* stated that the stock purchase agreement "shall be governed by, and construed in accordance with the Laws of the State of Delaware, regardless of the Laws that might otherwise govern under applicable principles of conflicts of law." *Id.* at 1046.

[34] *Id.* at 1048, 1049.

[35] *See, e.g.*, *Transdigm Inc. v. Alcoa Global Fasteners, Inc.*, 2013 WL 2326881, at *4-5 (Del. Ch. May 29, 2013) (following *Abry* to apply Delaware common law to fraud claims arising from stock purchase agreement with Delaware choice of law provision); *QTP Fund LP v. Eurohypo Capital Funding LLC I*, 2011 WL 2672092, at *8 (Del. Ch. July 8, 2011) (applying Delaware common law to determine interpretation of term "preference shares" as used in LLC and trust agreements with Delaware choice of law provisions); *Greetham v. Sogima L-A Manager, LLC*, 2008 WL 4767722, at *14 (Del. Ch. Nov. 3, 2008) (following *Abry* to apply Delaware common law to both contract and promissory

Delaware, which primarily would concern its common law, to decide questions concerning the interpretation and enforceability of a contract. What Section 2708 does not stand for, in my view, is a mechanism for the wholesale importation of every provision of Delaware statutory law into the commercial relationship of contracting parties. Significantly, A&R cites no authority construing Section 2708 in this manner, which would risk absurd results contrary to basic principles of statutory construction.[36] Would, for example, a Delaware choice of law provision stating that a merger agreement is to "be governed by" Delaware law trigger application of the Delaware tax code to a merger where it otherwise would not apply? Could entities incorporated outside of Delaware find themselves bound by the Delaware General Corporation Law's requirements for stockholder approval of a merger by including such a provision in their merger agreement, contrary to the internal affairs doctrine?[37] It is difficult to imagine that this was the intention of Section 2708 or that parties to a merger agreement ever

estoppel claims under LLC operating agreement containing Delaware choice of law provision); *Pharmathene, Inc. v. Siga Techs., Inc.*, 2008 WL 151855, at *7-8 (Del. Ch. Jan. 16, 2008) (citing *Abry*, Restatement Section 187 and 6 *Del. C.* § 2708 to apply Delaware common law to contract, tort and promissory estoppel claims where merger agreement contained Delaware choice of law provision).

[36] *See State v. Cooper*, 575 A.2d 1074, 1076 (Del. 1990) ("Literal or perceived interpretations, which yield illogical or absurd results, should be avoided in favor of interpretations consistent with the intent of the legislature."); *see also Reddy v. PMS Ins. Co.*, 20 A.3d 1281, 1288 n.33 (Del. 2011) (same) (collecting authorities).

[37] *See McDermott Inc. v. Lewis*, 531 A.2d 206, 215 (Del. 1987) ("The internal affairs doctrine requires that the law of the state of incorporation should determine issues relating to internal corporate affairs.") (citing *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983)).

20

would have intended these outcomes by virtue of including a choice law provision similar to Section 10.9 of the Merger Agreement here.

More to the point, construing Section 10.9 as A&R advocates would lead to the bizarre result of allowing contractual parties to convert a blue-sky law that was intended to regulate *intrastate* commerce into one that would apply to *interstate* commerce. A&R has not cited any authority suggesting that the General Assembly intended to rewrite the Delaware Securities Act in such a radical way *sub silentio* through the later adoption of Section 2708, and I decline to do so.[38] Indeed, this outcome not only would be inconsistent with the legislative intent of the Delaware Securities Act as discussed in *Singer*, but also would implicate issues of federal preemption.[39] Accordingly, I conclude that it would be unreasonable to construe Section 10.9 of the Merger Agreement to encompass the Delaware Securities Act and make it apply automatically in this case.

---

[38] The synopsis of the legislation resulting in Section 2708 does not mention the Delaware Securities Act. It states, in relevant part: "In many commercial transactions that have material relationships with jurisdictions other than Delaware, the parties choose Delaware law to govern their agreements. This Bill is designed to give maximum effect to the principle of freedom of contract and the enforceability of such provisions in contracts previously made and to be made, and to provide the parties to such agreements with certainty that courts sitting in Delaware will enforce such choice of law provisions." 69 Del. Laws ch. 127, § 1 (1993).

[39] *See, e.g.*, *Edgar v. MITE Corp.*, 457 U.S. 624, 641-43 (1982) (finding invalid Illinois blue-sky law "purport[ing] to regulate directly and to interdict interstate commerce, including commerce wholly outside the state") ("The Court's rationale for upholding blue-sky laws was that they only regulated transactions occurring within the regulating States. . . . The Commerce Clause also precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.").

21

Instead, the applicability of the Act must depend on whether a sufficient nexus exists between Delaware and the merger transaction at issue.

Turning to that analysis, the merger here was negotiated on the buy side by Mason Wells, a private equity firm, and on the sell side by FdG Logistics, the majority owner of Old A&R. Mason Wells is based in Milwaukee, Wisconsin.[40] FdG Logistics is a subsidiary of FdG Associates, which is based in New York City.[41] The headquarters of Old A&R at the time was in Morris, Illinois.[42] No negotiations concerning the merger are alleged to have taken place in Delaware, and none of the allegedly underlying fraudulent business practices or violations is alleged to have occurred in Delaware. The sole connection that A&R can draw to Delaware—that the merger parties were incorporated here—is insufficient under *Singer* and its progeny to demonstrate the required nexus. As the Court stated in *Eurofins*, "an allegation based solely on the status of certain parties to the litigation is insufficient to allege a nexus capable of stating a claim under the Delaware Securities Act."[43] In sum, A&R has failed to allege a sufficient nexus to Delaware to sustain a claim under the Delaware Securities Act. Count II is thus dismissed for failure to state a claim for relief.

---

[40] The Court takes judicial notice of the headquarters of Mason Wells listed in the "Notices" section of the Merger Agreement. *See* Merger Agreement § 10.2.

[41] Counterclaim ¶ 11.

[42] *See id.* ¶ 484.

[43] 2014 WL 2457515, at *18.

### 2. Count III States a Claim for Common Law Fraud Relating to Pre-Merger Materials

In Count III of its Counterclaim, Buyer asserts a claim for common law fraud against each of the Securityholders based, in part, on alleged misrepresentations and omissions concerning certain documents they provided to Buyer before it entered into the Merger Agreement. These documents, which I refer to as the "Pre-Merger Materials," include the July 2012 confidential information memorandum, the September 2012 management presentation, and other materials provided in due diligence.

> To state a fraud claim under Delaware common law,
>
> the plaintiff must plead facts supporting an inference that: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[44]

The Securityholders move to dismiss Count III for failure to state a claim for relief insofar as it relates to alleged misrepresentations outside the four corners of the Merger Agreement. More specifically, the Securityholders argue that Buyer cannot establish as a matter of law that it justifiably relied on any representations in any of the Pre-Merger Materials because of the effects of Sections 5.27 and 10.7 of the Merger Agreement.

Section 5.27, which is quoted in full below, states that Old A&R (defined in the Merger Agreement as the "Company") was not making any representation or warranty outside of the Merger Agreement and, more specifically, that it was not making any

---

[44] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005).

23

representation or warranty about any "projections, estimates or budgets" or "any other information or documents" with respect to Old A&R that were made available to the Buyer or its representatives:

> EXCEPT AS EXPRESSLY SET FORTH IN THIS <u>ARTICLE 5</u>, THE COMPANY MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED INCLUDING ANY IMPLIED REPRESENTATION OR WARRANTY AS TO CONDITION, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE. NOTWITHSTANDING ANYTHING TO THE CONTRARY, (A) THE COMPANY SHALL NOT BE DEEMED TO MAKE TO BUYER ANY REPRESENTATION OR WARRANTY OTHER THAN AS EXPRESSLY MADE BY THE COMPANY IN THIS AGREEMENT AND (B) THE COMPANY MAKES NO REPRESENTATION OR WARRANTY TO BUYER WITH RESPECT TO (I) ANY PROJECTIONS, ESTIMATES OR BUDGETS HERETOFORE DELIVERED TO OR MADE AVAILABLE TO BUYER OR ITS COUNSEL, ACCOUNTANTS OR ADVISORS OF FUTURE REVENUES, EXPENSES OR EXPENDITURES OR FUTURE FINANCIAL RESULTS OF OPERATIONS OF THE COMPANY UNLESS ALSO EXPRESSLY INCLUDED IN THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>ARTICLE 5</u>, OR (II) EXCEPT AS EXPRESSLY COVERED BY A REPRESENTATION AND WARRANTY CONTAINED IN THIS <u>ARTICLE 5</u>, ANY OTHER INFORMATION OR DOCUMENTS (FINANCIAL OR OTHERWISE) MADE AVAILABLE TO BUYER OR ITS COUNSEL, ACCOUNTANTS OR ADVISORS WITH RESPECT TO THE COMPANY.[45]

The integration clause in Section 10.7 of the Merger Agreement states as follows: "This Agreement, the Transaction Documents and the documents referred to herein and therein contain the entire agreement between the Parties and supersede any prior understandings,

---

[45] Merger Agreement § 5.27.

agreements or representations by or between the Parties, written or oral, which may have related to the subject matter hereof in any way."[46]

Delaware law enforces clauses which identify the specific information on which a party has relied and foreclose reliance on other information.[47] Numerous decisions of this Court have analyzed the enforceability of such clauses.[48] Most significantly, the law in this area is largely defined by then-Vice Chancellor Strine's decision in *Abry*, where he carefully considered the need to strike an appropriate balance between holding sophisticated parties to the terms of their contracts and simultaneously protecting against the abuses of fraud.[49] Surveying the case law at the time, the Vice Chancellor explained that:

> [t]he teaching of this court, through cases such as *Great Lakes*; *H–M Wexford*; *Progressive*, and *Kronenberg* is that a party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its

---

[46] *Id.* at § 10.7.

[47] *See, e.g.*, *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 116-17 (Del. 2012).

[48] *See, e.g.*, *Prairie Capital III, L.P. v. Double E Hldg. Corp*, 2015 WL 7461807 (Del. Ch. Nov. 24, 2015); *Anvil Hldg. Corp. v. Iron Acquisition Co., Inc.*, 2013 WL 2249655 (Del. Ch. May 17, 2013); *Abry P'rs V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032 (Del. Ch. 2006) (Strine, V.C.); *Kronenberg v. Katz*, 872 A.2d 568 (Del. Ch. 2004) (Strine, V.C.); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129 (Del. Ch. 2003); *Progressive Int'l. Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382 (Del. Ch. July 9, 2002) (Strine, V.C.); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544 (Del. Ch. 2001).

[49] *Abry*, 891 A.2d at 1058.

25

own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim.[50]

On the other hand, as the Court further explained, because of the venerable public policy to guard against fraud, we will not insulate a party from liability for its counterparty's reliance on fraudulent statements made outside of an agreement absent a clear statement by that counterparty—that is, the one who is seeking to rely on extra-contractual statements—disclaiming such reliance:

> [T]his court has consistently respected the law's traditional abhorrence of fraud in implementing this reasoning. Because of that policy concern, we have not given effect to so-called merger or integration clauses that do not clearly state that the parties disclaim reliance upon extra-contractual statements. Instead, we have held, as in *Kronenberg*, that murky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations. The integration clause must contain "language that . . . can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside of the contract's four corners in deciding to sign the contract." This approach achieves a sensible balance between fairness and equity—parties can protect themselves against unfounded fraud claims through explicit anti-reliance language. If parties fail to include unambiguous anti-reliance language, they will not be able to escape responsibility for their own fraudulent representations made outside of the agreement's four corners. [51]

Two recent decisions illustrate how this Court has applied the principles articulated in *Abry*. In *Anvil Holding Corp.*, a case on which Buyer relies, a buyer of a company asserted fraud claims based on extra-contractual statements where the purchase agreement stated that neither the subject company nor any seller "makes any other

---

[50] *Id.* at 1057.

[51] *Abry*, 891 A.2d at 1058-59 (quoting *Kronenberg*, 872 A.2d at 593).

26

express or implied representation or warranty with respect to the Company" and that the agreement "constitutes the entire Agreement among the Parties."[52]  Refusing to dismiss the fraud claims, the Court reasoned that these provisions were not expressed from the point of view of the buyer, and thus did not "reflect a clear promise *by the Buyer* that it was not relying on statements made to it outside of the Agreement to make its decision to enter the Agreement."[53]

More recently, in *Prairie Capital III, L.P. v. Double E Holdings Corp.*,[54] the Court reached the opposite conclusion in dismissing fraud claims that a buyer of a company asserted based on extra-contractual representations.  Critically, unlike in *Anvil*, the Court found that the provisions at issue[55] reflected an affirmative expression *by the aggrieved buyer* that it had relied only on the representations and warranties in the purchase agreement:

> The Exclusive Representations Clause is not framed negatively.  It does not say that the Buyer did not rely on any representations other than those set forth in the SPA [Stock Purchase Agreement].  Instead it is framed positively.  It represents affirmatively that the Buyer only relied on the

---

[52] 2013 WL 2249655, at *8.

[53] *Id.* (emphasis added).

[54] 2015 WL 7461807 (Del. Ch. Nov. 24, 2015).

[55] One of those provisions stated, in relevant part, that "[i]n making its determination to proceed with the Transaction, the Buyer has relied on (a) the results of its own independent investigation and (b) the representations and warranties of the Double E Parties expressly and specifically set forth in this Agreement" and that "THE BUYER UNDERSTANDS, ACKNOWLEDGES, AND AGREES THAT ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED . . . ARE SPECIFICALLY DISCLAIMED BY THE DOUBLE E PARTIES." *Id.* at *7.

representations and warranties in the SPA.  If a party represents that it only relied on particular information, then that statement establishes the universe of information on which that party relied.  Delaware law does not require magic words.  In this case, the Exclusive Representations Clause and the Integration Clause combine to mean that the Buyer did not rely on other information.  They add up to a clear anti-reliance clause.[56]

Here, similar to *Anvil* but unlike *Prairie Capital*, the critical language missing from Sections 5.27 and 10.7 of the Merger Agreement is any affirmative expression *by Buyer* of (1) specifically what it was relying on when it decided to enter the Merger Agreement or (2) that it is was not relying on any representations made outside of the Merger Agreement.  Instead, Section 5.27 amounts to a disclaimer *by the selling company* (Old A&R) of what it was and was not representing and warranting.  Moreover, the integration clause contained in Section 10.7 merely states in general terms that the Merger Agreement constitutes the entire agreement between the parties, and does not contain an unambiguous statement *by Buyer* disclaiming reliance on extra-contractual statements.

The difference between a disclaimer from the point of view of a party accused of fraud and from the point of view of a counterparty who believes it has been defrauded may seem inconsequential, like two sides of the same coin.  The difference is critical, however, because of the strong public policy against fraud.  As explained in *Abry*, the Court will not bar a contracting party from asserting claims for fraud based on representations outside the four corners of the agreement unless *that contracting party* unambiguously disclaims reliance on such statements.  The language to disclaim such

---

[56] *Id.* at *8.

reliance may vary, as the Court noted in *Prairie Capital*,[57] but the disclaimer must come from the point of view of the aggrieved party (or all parties to the contract) to ensure the preclusion of fraud claims for extra-contractual statements under *Abry* and its progeny. Because the language of Section 5.27 and 10.7 of the Merger Agreement does not contain this type of unambiguous anti-reliance disclaimer by Buyer, those provisions are not sufficient to preclude its common law fraud claim relating to the Pre-Merger Materials.

Finally, attempting to reconcile this case with *Abry*, the Securityholders assert that Section 5.27 of the Merger Agreement closely tracked the agreement at issue there because the *seller* in that case disclaimed making any contractual representations.[58] This argument is meritless. The Securityholders glaringly overlook a separate provision in *Abry* in which the *buyer* expressly agreed that it was not relying on any representations outside of the agreement:

> *Acquiror* acknowledges and agrees that neither the Company nor the Selling Stockholder has made any representation or warranty, express or implied, as to the Company or any Company Subsidiary or as to the accuracy or completeness of any information regarding the Company or any Company Subsidiary furnished or made available to Acquiror and its representatives, except as expressly set forth in this Agreement . . . and neither the Company nor the Selling Stockholder shall have or be subject to any liability to Acquiror or any other Person resulting from the distribution to Acquiror, or Acquiror's use or reliance on, any such information or any information, documents or material made available to acquirer in any "data rooms," "virtual data rooms," management presentations or in any other

---

[57] 2015 WL 7461807, at *9 ("Language is sufficiently powerful to reach the same end by multiple means, and drafters can use any of them to identify with sufficient clarity the universe of information on which the contracting parties relied.").

[58] *See* Countercl. Defs.' Reply Br. Supp. Mot. to Dismiss 26-27 n.10 (quoting Section 3.23 of the stock purchase agreement in *Abry*).

form in expectation of or in connection with, the transactions contemplated hereby.[59]

The above-quoted clause was the "critical provision" in *Abry* because it operated to "define what information the Buyer relied upon in deciding to execute the Agreement" and, "[b]y its plain terms, the Buyer promised that neither the Company nor the Seller had made any representation or warranty as to the accuracy of any information about the Company except as set forth in Agreement itself."[60]  Indeed, because of the potency of this provision, the buyer in *Abry* did not seek relief based on extra-contractual representations but instead amended its complaint "to premise its claims solely upon alleged misrepresentations of fact that are represented and warranted in the Stock Purchase Agreement itself."[61]  This kind of affirmative disclaimer from the point of view of Buyer is the critical piece that is missing in this case.[62]  Accordingly, the motion to dismiss Count III is denied.

### 3. Count IV of the Counterclaim Fails to State a Claim for Unilateral Mistake

In Count IV of its Counterclaim, A&R seeks to rescind the Merger Agreement based on its alleged unilateral mistake.  Rescission of a transaction because of a unilateral mistake is an extraordinary remedy.  It is only available under Delaware law when a party

---

[59] *Abry*, 891 A.2d at 1041 (emphasis added).

[60] *Id.*

[61] *Id.*

[62] Because the other cases on which the Securityholders rely were considered in *Abry*, which defines the operative standard, it is not necessary to consider them separately.

can demonstrate that "(1) the enforcement of the agreement would be unconscionable; (2) the mistake relates to the substance of the consideration; (3) the mistake occurred regardless of the exercise of ordinary care; and (4) it is possible to place the other party in the status quo."[63]  Count IV fails to state a claim for relief because A&R has failed to plead facts demonstrating that enforcement of the Merger Agreement would be unconscionable, and because it would not be possible to return the parties to the status quo over three years after the closing.

### a. Enforcement of the Merger Agreement Would Not Be Unconscionable

When analyzing unconscionability under Delaware law, "[t]he traditional test is this: a contract is unconscionable if it is such as no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept, on the other."[64]  As then-Vice Chancellor Strine noted in *Progressive*, "[t]he doctrine of unconscionability is sparingly used in the law . . . ."[65]  Continuing, he explained:

> For a contract clause to be unconscionable, its terms must be so one-sided as to be oppressive.  Put another way, unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.  Courts have been reluctant to apply the doctrine, recognizing among other things that the parties' bargaining power will

---

[63] *In re ENSTAR Corp.*, 604 A.2d 404, 411 (Del. 1992) (citing 13 Williston on Contracts § 1573 (3d ed. 1970)), *overruled on other grounds by Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665 (Del. 2013).

[64] *Tulowitzki v. Atl. Richfield Co.*, 396 A.2d 956, 960 (Del. 1978) (internal quotation marks omitted).

[65] 2002 WL 1558382, at *2 (Del. Ch. July 9, 2002).

rarely be equal. Further, courts are particularly reluctant to apply the doctrine in favor of sophisticated corporations.[66]

Here, sophisticated parties engaged in arm's-length negotiations over the terms of the Merger Agreement.[67] It is not alleged, nor would it be credible to suggest, that the Securityholders wielded such overwhelming bargaining power as to present Mason Wells, a private equity firm, with an absence of meaningful choice. Assuming all of its allegations to be true, Buyer may have vastly overpaid for Old A&R, but a dispute over price alone—even a substantial one—is not grounds for finding an agreement between sophisticated parties to be unconscionable.[68]

A&R relies on two cases for the proposition that "a sale is unconscionable if the buyer grossly overpays."[69] First, A&R characterizes *In Re ENSTAR Corp.* as a case where "a buyer's paying approximately double the value of what it purchased meant that 'enforcement of the parties' agreement would be unconscionable.'"[70] In *ENSTAR*,

---

[66] *Id.* at *11 (citing Farnsworth on Contracts § 4.28 (2d ed. 2000)) (internal quotation marks and modifications omitted).

[67] *See, e.g.*, Tr. of Oral Arg. at 97 (Nov. 16, 2015) (counsel for A&R: "We had sophisticated parties here. These weren't mom-and-pop operations."); *id* at 187 (counsel for FdG Logistics: ". . . let's start with the fact that the merger agreement is an agreement between sophisticated parties . . .").

[68] *See, e.g.*, *Bryant v. Way*, 2012 WL 1415529, at *12 (Del. Super. Apr. 17, 2012) ("Here, both parties are real estate brokers and former partners. There is no disparity in bargaining power. There is nothing unreasonable about the memorandum. While the date discrepancy has resulted in a dispute over a substantial sum, the financial implications alone do not make the agreement unreasonable.")

[69] A&R's Ans. Br. Opp'n Mot. to Dismiss 44.

[70] *Id.* at 44 (quoting *In Re ENSTAR*, 604 A.2d at 413).

however, it was not the price discrepancy that the Court found unconscionable, but rather the fact that sellers of securities mistakenly were "being paid for the value of their shares twice."[71] The other case on which A&R relies involved an overpayment in an appraisal action based on "two computational errors, which caused the Court to overstate the fair value of the shares by $2.27 per share."[72] The Court sensibly found that "[d]efendants are only entitled to the *fair value* determined by the Court, not an inflated value based on miscalculations."[73]

Neither of the cases on which Buyer relies is remotely similar to the situation here. Based on the facts alleged in the Counterclaim, it is not reasonably conceivable that A&R can demonstrate that it would be unconscionable to enforce the Merger Agreement.

### b. Rescission Would Not Be Feasible

Count IV also fails to state a claim for relief because it would not be possible in my view to return the parties to the status quo. "[T]he ordinary rule is that it is impractical to unwind a consummated merger."[74] As this Court stated in *Winston v. Mandor*, when assessing the feasibility of rescission:

---

[71] *In Re ENSTAR*, 604 A.2d at 413 ("[E]nforcement of the parties' agreement would be unconscionable because it would result in the Belzbergs being paid for their shares twice, a result which even the Belzbergs do not advocate.").

[72] *Am. Bottling Co. v. Crescent/Mach I P'rs, L.P.*, 2009 WL 3290729, at *1 (Del. Super. Sept. 30, 2009).

[73] *Id.* at *4.

[74] *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *6 n.3 (Del. Ch. Jan. 25, 1999), *aff'd*, 741 A.2d 16 (Del. 1999).

Two factors must go into the analysis: 1) the current circumstances of the challenged transaction, and 2) whether, the plaintiff would be unfairly prejudiced in some way by determination at this early stage of litigation, that he is foreclosed from obtaining a particular form of relief. Consideration of the first factor necessarily includes, among others, the time elapsed since completion of the challenged transaction; the complexity of that transaction, and thus the difficulty of undoing it; whether the transaction involves publicly traded securities and the percentage and number of such shares in public hands; possible unfair prejudice to the defendant(s) if the transaction were rescinded. The second factor is a relatively straightforward inquiry: Assuming plaintiff were to prevail on all of the claims as alleged in the complaint, would plaintiff be unfairly prejudiced in some way by relegation to a monetary equivalent (*i.e.* rescissory damages) rather than the equitable relief originally sought.[75]

Examining the first factor, the current circumstances of the challenged transaction weigh decisively against the feasibility of rescission. To start, A&R did not seek rescission until about 22 months after the merger closed. Over three years have now passed since the closing, which is a lifetime in the operation of a business.[76] During that period, Buyer relocated the company's headquarters, replaced the entire management team, and sold the tank wash in Joliet, Illinois, which features prominently in Buyer's allegations of fraud.[77] Unwinding the merger would be unduly complicated due to these and other changes A&R has made since taking over the company. Put differently, if forced to return the merger consideration and to retake ownership of the Trucking Company, the Securityholders would own a company fundamentally different from the one they sold over three years ago.

---

[75] 710 A.2d 831, 833-34 (Del. Ch. 1996).

[76] The Court in *Winston* found that the passage of "one full year . . . weigh[ed] against undoing the transactions." *Id.* at 834.

[77] Counterclaim ¶¶ 8, 53-55, 258, 484.

As to the second *Winston* factor, an award of money damages would not unduly prejudice A&R if it prevails on its fraud claims. In fact, A&R's Counterclaim explicitly seeks damages as an alternative to rescission.[78] If A&R proves its fraud claims, moreover, the amount of damages it may recover is not limited under the Merger Agreement, which carves out from the indemnification cap losses arising in respect of "fraud or intentional breach."[79] Given A&R's ability to recover an uncapped amount of damages if it can prove its fraud claims, it would not suffer unfair prejudice by the absence of a rescission remedy.

Finally, A&R argues it is inappropriate to rule out the feasibility of rescission on a motion to dismiss. I disagree. This Court has not hesitated to make this call on a motion to dismiss where, as here, it is apparent that the remedy of rescission would "be impracticable and the dismissal of that remedy in light of the requested alternatives, not unfairly prejudicial."[80] Here, I "can conceive of no possible circumstance in which I would rescind the Merger,"[81] which closed more than three years ago. Accordingly, Count IV of the Counterclaim is dismissed for this reason as well as A&R's failure to plead facts demonstrating that enforcement of the Merger Agreement would be unconscionable.

---

[78] *Id.* at 182(c). *See also* Tr. of Oral Arg. at 184 (Nov. 16, 2015).

[79] Merger Agreement § 9.3(D).

[80] *Winston v. Mandor*, 710 A.2d 831, 832-35 (Del. Ch. 1996) (granting motion to dismiss rescission claim); *see also RGC Int'l Investors, LDC v. Greka Energy Corp.*, 2000 WL 1706728, at *16 n.59 (Del. Ch. Nov. 8, 2000) (Strine, V.C.) (same).

[81] *RGC Int'l Investors*, 2000 WL 1706728 at *16 n.59.

35

### B. FdG Logistics' Motion for Summary Judgment

The complaint that started this action asserts a single claim demanding that A&R promptly remit to FdG Logistics, as the Securityholders' Representative, the 2012 Tax Refund under Section 9.6(E) of the Merger Agreement, which governs the disposition of pre-closing tax refunds. FdG Logistics has moved for summary judgment on this claim. This motion is straightforward.

Under Court of Chancery Rule 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The evidence must be viewed in the light most favorable to the non-moving party, and summary judgment is warranted only where no rational trier of fact would fail to find that the moving party is entitled to judgment.[82]

Section 9.6(E) of the Merger Agreement plainly states that any tax refunds received after closing for pre-closing periods are the "property" of the Securityholders and that they should be paid "promptly" to the Securityholders' Representative on behalf of the Securityholders. When "a writing is plain and clear on its face, *i.e.* its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an

---

[82] *See Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150-51 (Del. 2002) ("[T]he judge as gate-keeper merely considers whether the finder of fact could come to a rational conclusion either way . . . .").

understanding of intent."[83]   A&R does not contend that Section 9.6(E) is ambiguous in any respect.

There also is no dispute as to any material fact concerning the 2012 Tax Refund. A&R admits that A&R's 2012 federal and state tax returns relate to pre-closing tax periods,  that A&R has received $2,080,650 in refunds in connection with those filings, and that it has not remitted those refunds to FdG Logistics as the Securityholders' Representative.[84]   Based on a straightforward application of these undisputed facts and the plain language of the contract, A&R has breached Section 9.6(E) of the Merger Agreement by refusing to pay over the 2012 Tax Refund to FdG Logistics as the Securityholders' Representative.

Unable to identify any ambiguity in the text of Section 9.6(E) or any genuine issue of material fact,[85] A&R opposes the entry of summary judgment based on its demand for rescission, which it seeks under the Delaware Securities Act and based on a unilateral

---

[83] *City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993) (citing *Citadel Hldgs. Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992).

[84] Answer ¶¶ 17-18, 21.

[85] In opposition to the summary judgment motion, A&R submitted an affidavit under Court of Chancery Rule 56(f) in which it asserts that discovery "is in the early stages" and "Buyer does not have access to many of the facts needed to flesh out its counterclaims, or the corresponding defenses to plaintiff's claims."   The affidavit describes the need for discovery to support A&R's fraud claims and is not relevant to FdG Logistics' claim for summary judgment on the 2012 Tax Refund.  Thus, I decline to deny the motion for summary judgment based on this affidavit.  *See Intrepid Invs., LLC v. Selling Source, LLC*, 2015 WL 6157318, at *4 (Del. Ch. Oct. 20, 2015) ("Because discovery within the context of Rule 56(f) would not be material to the Court's summary judgment decision, Intrepid's motion for relief under that rule is denied . . . .").

mistake. According to A&R, if the Merger Agreement were rescinded, A&R would owe no contractual obligation to remit the 2012 Tax Refund to the Securityholders' Representative.[86] A&R also argues that, even if it could not obtain rescission under the Delaware Securities Act, FdG Logistics would not be entitled to summary judgment as long as A&R can establish any right to relief under the Act. That is because the Delaware Securities Act provides that "[n]o person who has made or engaged in the performance of any contract in violation of any provision of this chapter . . . may base any suit on the contract."[87] In short, all of the grounds A&R advances to defeat the motion for summary judgment depend on the viability of its claims under the Delaware Securities Act and for rescission based on a unilateral mistake. Because I have concluded that A&R fails to state a claim for relief on both of those grounds, A&R has no defense to FdG Logistics' motion and summary judgment will be entered in FdG Logistics' favor.

As part of its summary judgment motion, FdG Logistics requests the entry of a partial final judgment under Court of Chancery Rule 54(b) so that it may receive the payment for the 2012 Tax Refund now and not have to wait until the remaining claims in this case have been adjudicated. A&R counters that an interlocutory payment to FdG Logstics would be inappropriate because the damages A&R seeks in its Counterclaim far exceed the amount of the 2012 Tax Refund. According to A&R, it "rarely makes sense

---

[86] There is no equity in this argument. Even if the merger were rescinded, A&R still would have no right to the 2012 Tax Refund because, in that event, the refund would belong to Old A&R, the ownership of which would return to the Securityholders.

[87] 6 *Del. C.* § 73-605(f).

38

to order *payment* on a smaller claim until it is known whether it will be swallowed up by a larger one."[88] A&R grounds this argument on what it describes as "principles of offset—and of common sense,"[89] rather than citing any binding authority mandating the result it seeks.

The flaw in A&R's argument is that it cannot be squared with the plain language of the Merger Agreement. As discussed above, Section 9.6(E) of the Merger Agreement expressly provides that A&R "shall promptly pay" pre-closing tax refunds to the Securityholders' Representative. A&R, a sophisticated contracting party, could have bargained for the right to delay payment of the tax refunds pending the resolution of its indemnification or other claims arising out of Merger Agreement. It did not do so. To the contrary, it agreed when it signed the Merger Agreement to "promptly" remit pre-closing tax refunds to the Securityholders' Representative while simultaneously agreeing that $10.4 million of the merger price would be withheld and placed in an escrow account as security for indemnification claims.[90] It would be inappropriate to rewrite the unambiguous terms of the Merger Agreement governing pre-closing tax refunds to have it serve A&R's current strategic interests in delaying payment of an obligation that is now owed.[91]

---

[88] A&R's Ans. Br. Opp'n Mot. Summ. J. 28.

[89] *Id.* at 27.

[90] Merger Agreement §§ 2.13(B)(5), 9.5.

[91] *See Fletcher Int'l, Ltd. v. Ion Geophysical Corp.*, 2011 WL 1167088, at *5 (Del. Ch. Mar. 29, 2011) ("Fletcher, a sophisticated contracting party, could have bargained for the

39

There is, in short, no just reason to delay payment of the 2012 Tax Refund to the Securityholders' Representative. Accordingly, I will enter a partial final judgment under Court of Chancery Rule 54(b) requiring that payment of the 2012 Tax Refund, plus interest, be made to the Securityholders' Representative within ten days after the entry of judgment. I also will enter a final judgment under Rule 54(b) concerning the dismissal of A&R's claims under the Delaware Securities Act and for rescission based on unilateral mistake (Counts II and IV of the Counterclaim) because A&R argues that they provide a defense to the 2012 Tax Refund claim. In this way, all of the issues potentially relevant to the 2012 Tax Refund claim may considered together if A&R wishes to seek appellate review.

## III.   CONCLUSION

For the foregoing reasons, the Securityholders' motions to dismiss Counts II and IV of the Counterclaim are granted, and denied as to Count III of the Counterclaim. FdG Logistics' motion for summary judgment is granted. A form of implementing order accompanies this opinion.

---

right it now in effect claims . . . . It did not, and this court is not empowered to rewrite an unambiguous contract in order to have it meet Fletcher's current business needs.").