# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| POST HOLDINGS, INC. and MICHAEL FOODS OF DELAWARE, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2017-0772-AGB |
| NPE SELLER REP LLC, SAFE EGG LLC, THE MARVIN AND DONNA AARDEMA FAMILY PARTNERSHIP, LOST CREEK RANCH, LLC, BRIAN BOOMSMA, HOPEWELL VENTURES, L.P., R.W. DUFFY COX, GREGORY M. WEST, CHUCK LEIS, MICHAEL SMITH, JAY BERGLIND, HECTOR LARA, and D. WILLIAM TOONE, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| NPE SELLER REP LLC, | ) ) | |
| Counter-Plaintiff, | ) ) | |
| v. | ) ) ) | |
| POST HOLDINGS, INC. and MICHAEL FOODS OF DELAWARE, INC., | ) ) ) | |
| Counter-Defendants. | | |

## MEMORANDUM OPINION

Date Submitted: September 12, 2018
Date Decided: October 29, 2018

Rodger D. Smith II, Ryan D. Stottmann, and Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Richard B. Walsh, Jr. and Evan Z. Reid, LEWIS RICE LLC, St. Louis, Missouri, *Attorneys for Plaintiffs and Counter-Defendants Post Holdings, Inc. and Michael Foods of Delaware, Inc*.

Kevin R. Shannon, Christopher N. Kelly, and Jay G. Stirling, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; William C. O'Neil, Jeffrey J. Huelskamp, and Michael A. Meneghini, WINSTON & STRAWN LLP, Chicago, Illinois, *Attorneys for Defendants Safe Egg, LLC, The Marvin and Donna Aardema Family Limited Partnership, Lost Creek Ranch, LLC, Brian Boomsma, Hopewell Ventures, L.P., R.W. Duffy Cox, Gregory M. West, Chuck Leis, Michael Smith, Jay Berglind, Hector Lara, D. William Toone, and Defendant/Counter-Plaintiff NPE Seller Rep LLC.*

**BOUCHARD, C.**

In October 2016, Michael Foods of Delaware, Inc. acquired all of the shares of National Pasteurized Eggs, Inc. for approximately $93.5 million pursuant to the terms of a Stock Purchase Agreement. About one year later, Michael Foods and its parent company, Post Holdings, Inc., filed this action against the sellers and their representative asserting claims for fraud and for breach of representations and warranties in the agreement that form the basis of a demand for indemnification they made under the agreement. The sellers' representative then filed counterclaims to enforce covenants in the agreement requiring the buyers to remit to the sellers' representative approximately $974,000 in tax refunds and insurance proceeds pertaining to the pre-closing period.

The sellers' representative has moved for judgment on the pleadings on its counterclaims. Michael Foods and Post Holdings oppose the motion on essentially two grounds. They argue that the obligation to remit the tax refunds and insurance proceeds in question should be excused by virtue of the sellers' prior material breach of representations and warranties in the agreement. Relying on a netting provision in the section of the agreement governing tax refunds, they also argue that the agreement permits them to refuse to remit the tax refunds at issue because the amount of their indemnification claim in this action exceeds the amount of those tax refunds.

1

For the reasons discussed below, the court concludes that both of the buyers' arguments fail as a matter of law and that the sellers' representative is entitled to judgment on the pleadings on its counterclaims. The buyers' prior material breach argument fails because, even if the sellers did materially breach the agreement, buyers cannot continue to accept the benefits of the contract—as they seek to do in this action through their claim for indemnification—while disclaiming their contractual obligation to remit the tax refunds and insurance proceeds to the sellers promptly after they were received. The buyers' second argument fails because the agreement only permits indemnification payments that are "owed" to be netted against tax refunds and does not permit taking an offset for unliquidated claims for indemnification. Finally, entry of final judgment on the counterclaims under Court of Chancery Rule 54(b) is appropriate under the circumstances of this case.

## I.  BACKGROUND

The facts recited in this opinion come from the parties' pleadings[1] and documents incorporated therein.[2] Any additional facts are either not subject to reasonable dispute or are subject to judicial notice.

---

[1] The relevant pleadings are the Amended Verified Complaint ("Complaint"), Defendants' Answer, Defenses, and Verified Counterclaims to Plaintiffs' Amended Verified Complaint (respectively, the "Answer" and "Counterclaim"), and Plaintiffs' Reply to Defendants' Verified Counterclaims to Plaintiffs' Amended Verified Complaint ("Reply"). Dkt. 18, 21, 28.

[2] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court

### A. The Parties

Plaintiff Post Holdings, Inc., a Missouri corporation, is a consumer packaged goods holding company headquartered in St. Louis, Missouri. Plaintiff Michael Foods of Delaware, Inc. ("Michael Foods"), a wholly owned subsidiary of Post Holdings, is incorporated in Delaware and headquartered in Minnetonka, Minnesota. Post Holdings and Michael Foods are referred to together at times as the "Buyers."

Non-party National Pasteurized Eggs, Inc. ("NPE") is a producer of pasteurized shell eggs based in Lansing, Illinois. Defendants Safe Egg LLC, The Marvin and Donna Aardema Family Partnership, Lost Creek Ranch, LLC, Brian Boomsma, Hopewell Ventures, L.P., R.W. Duffy Cox, Gregory M. West, Chuck Leis, Michael Smith, Jay Berglind, Hector Lara, and D. William Toone (collectively, the "Securityholders") were stockholders of NPE before the transaction at issue in this case. The Securityholders are each parties to the Stock Purchase Agreement, which designates defendant NPE Seller Rep LLC, a Delaware limited liability company, as their representative (the "Seller Representative").[3] The Securityholders and the Seller Representative are referred to collectively at times as the "Sellers."[4]

---

from considering those documents' actual terms" in connection with the motion to dismiss) (citations and internal quotations omitted).

[3] Answer ¶¶ 4, 12.

[4] The court uses the terms "Buyers" and "Sellers" for simplicity, as the parties did in their papers, recognizing that Michael Foods (and not Post Holdings) acquired the shares of NPE from the Securityholders (and not from the Seller Representative).

3

## B. The Stock Purchase Agreement

On August 31, 2016, the Buyers and Sellers entered into a Stock Purchase Agreement (the "Agreement") in which Michael Foods agreed to purchase all of the Securityholders' shares of NPE stock for $93.5 million, subject to certain post-closing adjustments.[5] The transaction closed on October 3, 2016.[6] Post Holdings guaranteed "unconditionally the payment and performance of all of [Michael Foods'] obligations" in the Agreement.[7]

The Agreement provides that the Securityholders would indemnify the Buyers after the closing for "all costs, losses, Taxes, Liabilities, obligations, damages, Actions, and expenses (whether or not arising out of third-party claims), including reasonable attorneys' fees" that arise from "any inaccuracy in or breach of any representation or warranty made by [NPE] in or pursuant to this Agreement, any Ancillary Agreement, or in any certificate or other closing document delivered pursuant to this Agreement."[8] Under the terms of the Agreement and an accompanying Escrow Agreement, a $7.5 million escrow fund was established, which set aside funds to pay for indemnification obligations.[9]

---

[5] Reply ¶ 19.

[6] Answer ¶ 3.

[7] Defs.' Opening Br., Ex. 1 § 10.13.

[8] *Id.* § 8.2(a).

[9] *Id.* § 8.2(e); Answer ¶ 8.

4

The Agreement also obligates Michael Foods and NPE (as a subsidiary of Michael Foods after the closing) to remit to the Seller Representative certain tax refunds and insurance proceeds for the pre-closing period promptly after their receipt. Specifically, Section 6.7(e) of the Agreement, which deals with tax refunds, provides in relevant part that, subject to a netting provision discussed later in this opinion, Michael Foods shall pay to the Seller Representative any tax refund for the pre-closing period "within fifteen (15) days of receipt or entitlement thereto."[10] Section 6.8 of the Agreement, which deals with insurance proceeds, similarly provides in relevant part that NPE shall, "reasonably promptly after receipt thereof, pay to the Seller Representative . . . any net business interruption insurance proceeds . . . received by [NPE] after the Closing Date with respect to the matters described on ***Schedule 3.11(b)***."[11]

### C. Buyers Discover Alleged Misrepresentations After the Closing

After the transaction closed, Buyers allegedly discovered various misrepresentations Sellers made during due diligence and in the Agreement itself. These alleged misrepresentations generally concern three subjects: (1) NPE's compliance with immigration laws, (2) the condition of NPE's production

---

[10] Defs.' Opening Br., Ex. 1 § 6.7(e).

[11] *Id.* § 6.8 (emphasis in original). Schedule 3.11(b) discloses that NPE recently had experienced a power outage at one of its facilities and that NPE planned to file a business interruption insurance claim relating to that power outage. Reply ¶ 26.

equipment, and (3) the production capacity of its pasteurizers.[12] Buyers filed a claim notice asking for indemnification under the Agreement for the entire amount of the escrow fund based on these alleged misrepresentations.[13] Sellers rejected this demand.

### D. Tax Refunds and Insurance Proceeds for the Pre-Closing Period

Since April 2017, Buyers have received various state and federal income tax refunds that are covered by Section 6.7 of the Agreement, totaling $552,395.86.[14] Buyers also received during this period two payments of insurance proceeds covered by Section 6.8 of the Agreement, totaling $422,040.68 net of collection expenses.[15] The combined total of the tax refunds and insurance proceeds at issue is $974,436.54. After Buyers failed to remit these tax refunds and insurance proceeds to Sellers, Sellers submitted claim notices for indemnification to Buyers, requesting that these amounts be remitted to Sellers.[16] To date, Buyers have refused to do so.[17]

---

[12] Compl. ¶¶ 43-53, 54-63, 64-68.

[13] *Id.* ¶¶ 22, 91.

[14] Reply ¶¶ 29, 30, 45, 55, 59.

[15] *Id.* ¶¶ 38, 52.

[16] *Id.* ¶¶ 39, 48, 58.

[17] *Id.* ¶¶ 34, 38, 48, 63.

## II.    PROCEDURAL HISTORY

On October 27, 2017, Buyers filed this action.  Their Complaint, as amended, asserts three claims:  fraud (Count I), breach of representations and warranties in the Agreement that form the basis of a claim for indemnification (Count II), and specific performance for release of the escrow fund (Count III).[18]

On January 24, 2018, Sellers filed their answer and the Seller Representative filed two counterclaims for (1) breach of the Agreement for failing to remit the tax refunds and insurance proceeds and (2) specific performance of Buyers' duty to remit the tax refunds and insurance proceeds.[19]  That same day, Sellers moved to dismiss Buyers' fraud claim under Court of Chancery Rules 12(b) and 9(b) for failure to state a claim for relief and to plead fraud with particularity.[20]

On May 18, 2018, the court granted in part and denied in part Sellers' motion to dismiss the fraud claim.  Specifically, the motion was granted except insofar as Buyers' fraud claim was based on representations made in Sections 3.5, 3.14, and 3.18(c) of the Agreement and on certain extra-contractual representations made during due diligence concerning the production capacity of NPE's pasteurization systems.[21]

---

[18] Compl. ¶¶ 69-92.

[19] Dkt. 21; Countercl. ¶¶ 72-86

[20] Dkt. 22.

[21] Dkt. 48 at 4.

On June 7, 2018, the Seller Representative moved under Court of Chancery Rule 12(c) for judgment on the pleadings on both of its counterclaims.[22] On September 12, 2018, after briefing on the motion had been completed, the parties asked the court to decide the motion without argument.[23]

## III.   ANALYSIS

The court will grant a motion for judgment on the pleadings under Court of Chancery Rule 12(c) when "no material issue of fact exists and the movant is entitled to judgment as a matter of law."[24] The court must view the facts pleaded in the light most favorable to the non-moving party, and draw reasonable inferences in the non-moving party's favor.[25] The court, however, is not "required to accept as true conclusory assertions unsupported by specific factual allegations, particularly when those assertions do no[t] comport with the terms of a clear and unambiguous contract."[26]

---

[22] Dkt. 49.

[23] Dkt. 60.

[24] *Aveta Inc. v. Bengoa*, 2008 WL 5255818, at *2 (Del. Ch. Dec. 11, 2008) (quoting *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund*, 624 A.2d 1199, 1205 (Del. 1993)).

[25] *Id.*

[26] *GreenStar IH Rep, LLC v. Tutor Perini Corp.*, 2017 WL 5035567, at *5 (Del. Ch. Oct. 31, 2017) (internal quotations and citations omitted).

8

"When analyzing a contract on a motion for judgment on the pleadings, this Court will grant such a motion only if the contract provisions at issue are unambiguous."[27] "Ambiguity does not exist simply because the parties disagree about what the contract means. . . . Rather, contracts are ambiguous when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[28] In short, "[j]udgment on the pleadings is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."[29]

It is undisputed that Michael Foods has not remitted to Sellers tax refunds and insurance proceeds relating to the pre-closing period in the amounts specified above, and that Post Holdings is obligated under the Agreement to guarantee Michael Foods' payment obligations. Buyers opposition to the motion for judgment on the pleadings instead turns on two arguments that, in the court's opinion, can be resolved as a matter of law and require entry of judgment in favor of the Seller Representative on both of its counterclaims.

---

[27] *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2013 WL 5787958, at *4 (Del. Ch. Oct. 25, 2013).

[28] *Id.* (quoting *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007)).

[29] *GreenStar*, 2017 WL 5035567, at *5 (alteration in original) (quoting *Lillis v. AT&T Corp.*, 904 A.2d 325, 329 (Del. Ch. 2006)).

9

**A.    Buyers Are Not Excused from Performing Their Obligations Under the Agreement Based on an Alleged Prior Material Breach Because They Have Elected to Enforce the Agreement**

Buyers' primary argument for why they are not required to remit the tax refunds and insurance proceeds is based on a theory of prior material breach. Specifically, Buyers assert that because Sellers materially breached various representations and warranties in the Agreement, which were made "as of the date of [the] Agreement and as of the Closing,"[30] the Buyers are excused from any post-closing obligation to remit the tax refunds and insurance proceeds that otherwise might be owed under Sections 6.7 and 6.8 of the Agreement.

Sellers make essentially two arguments in response.[31]  Sellers first contend that Buyers cannot continue to retain the benefits of the Agreement while simultaneously failing to perform their obligations under it.  Sellers next argue that

---

[30] Defs.' Opening Br., Ex. 1, Art. III.

[31] Sellers also contend that Buyers' theory of prior material breach is an affirmative defense for which "they have failed to allege well-pled facts to support any claim of prior material breach by Sellers" and actually "have done the opposite" by pleading that the Agreement is valid, binding, and legally enforceable. Defs.' Reply Br. 6.  For the reasons explained above, the court agrees that Buyers' endorsement of the Agreement's validity and enforceability in connection with their pursuit of an indemnification claim against Sellers under the Agreement undermines Buyers' contention that they should be excused from performing their obligations under the Agreement. The court disagrees, however, with the suggestion that Buyers have failed to plead facts to support a claim for breach of the Agreement.  Count II of Buyers' complaint asserts a claim for breach of representations and warranties in the Agreement.  Sellers did not seek to dismiss Count II of Buyers' Complaint and instead answered that claim.  In doing so, Sellers tacitly admitted the sufficiency of the factual allegations pled in support of Count II.

10

the alleged breach of the Agreement was not material, so Buyers' performance would not be excused in any event. Because Sellers' first argument is dispositive, I do not address the second argument.

Under Delaware law, which governs the Agreement,[32] a party may be "excused from performance under a contract if the other party is in material breach thereof."[33] It also is well-settled, however, that a party may not refuse to perform its contractual obligations after a material breach while simultaneously retaining the benefits of a contract.[34] As a leading treatise explains: "When there has been a material failure of performance by one party to a contract . . . the [other] party has the choice to continue to perform under the contract or to cease to perform, and conduct indicating an intention to continue the contract in effect will constitute a conclusive election, in effect waiving the right to assert that the breach discharged any obligation to perform."[35]

---

[32] Defs.' Opening Br., Ex. 1 § 10.3.

[33] *Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *24 (Del. Ch. Aug. 18, 2016) (quoting *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013)).

[34] *See DeMarie v. Neff*, 2005 WL 89403, at *5 (Del. Ch. Jan. 12, 2005) ("[T]he nonbreaching party may not, on the one hand, preserve or accept the benefits of a contract, while on the other hand, assert that contract is void and unenforceable.").

[35] 14 *Williston on Contracts* § 43.15 (4th ed. 2018); *see also In re Mobilactive Media, LLC*, 2013 WL 297950, at *14 (Del. Ch. Jan. 25, 2013) (citing *DeMarie* and *Williston* § 43.15 to conclude that a party's failure to perform under the contract did not prevent it from recovering when the other party continued to accept the benefits of the contract).

Based on these well-established principles, even assuming that Sellers did materially breach the Agreement, Buyers only could condition their non-performance on that breach if Buyers did not subsequently continue performing under the contract or indicate an intent to do so by seeking benefits from the contract.[36] Sellers assert that because Buyers are seeking to retain the benefits of the Agreement, including by "pursuing contractual indemnification claims under the Agreement," Buyers can no longer argue that their performance is excused by a material breach.[37] I agree.

By utilizing the indemnification process in the Agreement and seeking the funds in the escrow account that were set aside to pay for valid indemnification claims, Buyers clearly have indicated "an intention to continue the contract."[38] Indeed, Buyers specifically have alleged, both in their own Complaint and in response to Sellers' Counterclaim, that the "Agreement is a valid, binding and legally enforceable written contract."[39] Buyers have not expressed a belief that the contract is unenforceable nor have Buyers sought to rescind the Agreement. Instead, they have pressed for indemnification under the Agreement for alleged breaches of

---

[36] *See Mobilactive Media*, 2013 WL 297950, at *14 ("By continuing to accept the benefits of the contract, however, [the party] essentially admitted to its validity.").

[37] Defs.' Reply Br. 5.

[38] 14 *Williston on Contracts* § 43.15

[39] Compl. ¶ 82; Reply ¶ 74 (admitting that the Agreement "is a valid, binding and legally enforceable contract").

12

representations and warranties in the Agreement as well as for specific performance for release of the escrow fund.[40] Because Buyers' conduct clearly indicates a desire to continue to accept the benefits of the Agreement after Sellers' alleged material breach, Buyers must continue to be bound by and to perform under the contract as well, irrespective of whether Sellers materially breached the Agreement. Accordingly, Buyers' first line of argument against Sellers' motion fails as a matter of law.

## B. Buyers May Not Avoid Remitting the Tax Refunds Based on Their Unliquidated Claim for Indemnification Under the Agreement

As a secondary matter, Buyers argue that the motion for judgment on the pleadings should be denied with respect to the tax refunds in question because Section 6.7(e) of the Agreement contemplates that Buyers may take an offset for the amount of any indemnification payment Sellers owe to Buyers. According to Buyers, because the amount of their indemnification claim against Sellers in this action far exceeds the amount of the tax refunds they received for the pre-closing period, they are not obligated to remit those tax refunds to Seller Representative. This argument only applies to tax refunds and has no bearing on insurance proceeds

---

[40] Compl. ¶¶ 82-87, 89-92.

relating to the pre-closing period, which are governed by a different provision of the Agreement that does not permit such an offset.[41]

The critical assumption underlying Buyer's argument is that they "were excused *when [Sellers] materially breached their representations and warranties*" from remitting to Sellers the tax refunds in question as opposed to when their claim for indemnification has been liquidated.[42] In my opinion, this interpretation cannot be squared with the plain language of the Agreement.

Section 6.7(e) of the Agreement provides, in relevant part, that:

> If [NPE], its Subsidiary, or an Affiliate thereof actually receives a credit with respect to, or refund of, any Tax paid by or on behalf of [NPE] or its Subsidiary with respect to any Pre-Closing Period or Pre-Closing Straddle Period or taken into account in determination of the Pre-Closing Tax Obligations, [Michael Foods] shall pay over to the Seller Representative (to be distributed by the Seller Representative to the Securityholders based upon their respective Allocable Portions) the amount of such refund or credit within fifteen (15) days of receipt or entitlement thereto . . . <u>provided</u>, that . . . [Michael Foods] shall only be required to pay the amount of any such refund net of (A) the amount of ***any indemnification payment owed*** by Securityholders to [Michael Foods] or [NPE] . . . .[43]

This provision clearly allows Buyers to reduce the amount of the tax refunds to be remitted to Sellers by the amount of an "indemnification payment" that is "owed"

---

[41] *See* Defs.' Opening Br., Ex. 1 § 6.8.

[42] *See* Pls.' Opp'n Br 9.

[43] Defs.' Opening Br., Ex. 1 § 6.7(e) (emphasis added).

by Sellers to Buyers.  What this provision does not say is that Buyers may net from such tax refunds the amount of their *unliquidated claims for indemnification.*

At common law, "[a] contingent or unmatured obligation which is not presently enforceable cannot be the subject of set-off" or, put differently, "[t]here is no right to set-off of a possible unliquidated liability against a liquidated claim that is due and payable."[44]  Delaware law, of course, "encourages parties to contract freely to create those contractual rights they see fit."[45]  Thus, the parties certainly could have created a contractual right to permit Buyers to net against a tax refund to be remitted to Sellers the amount of an indemnification *claim.*  In one case, for example, this court found that the parties had done so where the contract stated that a  party may "set off all or any portion of the claimed amount of any . . . Direct Claim."[46]  Here, however, the parties did not do so.  Instead, the plain language of Section 6.7(e) expressly limits what Buyers can net against tax refunds to the amount of an indemnification payment that is "*owed*," which implies that the

---

[44] *CanCan Dev., LLC v. Manno*, 2011 WL 4379064, at *5 (Del. Ch. Sept. 21, 2011) (quoting 80 C.J.S. *Set-Off and Counterclaim* §§ 3, 58 (2011)).

[45] *Brace Indus. Contracting, Inc. v. Peterson Enters., Inc.*, 2017 WL 2628440, at *4 (Del. Ch. June 19, 2017).

[46] *Id.* at *3-4 (rejecting argument that a set-off for a "contingent unliquidated sum" was impermissible where the contract expressly provided a right of set-off for a "claimed amount").

"indemnification payment" in question is for a presently payable amount and not some uncertain amount that is contingent in nature.

Significantly, this interpretation is the only one that can be squared with the requirement in Section 6.7(e), quoted above, that the amount of a tax refund must be remitted "within fifteen (15) days of receipt or entitlement thereto."[47]  This temporal requirement would be rendered meaningless as a practical matter if Buyers could use unliquidated indemnification *claims* to offset a tax refund they received, contrary to fundamental principles of contract construction that a contract be read as a whole and that meaning be given to all provisions.[48]  Put differently, allowing Buyers to hold tax refunds for an indeterminate and potentially prolonged period of time to resolve an indemnification dispute would be inconsistent with the contractual bargain reflected in Section 6.7(e) that contemplates the remittance of tax refunds within a relatively short fifteen-day period after Buyers have received or become entitled to them.  Giving meaning to all the provisions in the Agreement, the court concludes that the plain language of Section 6.7(e) supports Sellers' position that

---

[47] Defs.' Opening Br., Ex. 1 § 6.7(e).

[48] *See Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) ("When interpreting a contract, this court will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all of its provisions.") (internal quotations omitted); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as to not render any part of the contract mere surplusage.  We will not read a contract to render a provision or term meaningless or illusory.") (internal quotations omitted).

Buyers cannot rely on the netting provision therein to avoid remitting the tax refunds at issue.

* * * * *

For the reasons explained above, the court concludes that the Seller Representative is entitled to entry of judgment in its favor on its counterclaims.  I turn next to the Seller Representative's request that final judgment be entered on these claims under Court of Chancery Rule 54(b).

### C.    There Being No Just Reason for Delay, Final Judgment Shall Be Entered on the Counterclaims Under Rule 54(b)

Court of Chancery Rule 54(b) provides, in relevant part, that "[w]hen more than 1 claim for relief is presented in an action, . . . the Court may direct the entry of a final judgment upon 1 or more but fewer than all of the claims . . . only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."  To grant such a motion, the court must find: "(1) the action involves multiple claims or parties, (2) at least one claim . . . has been finally decided, and (3) that there is no just reason for delaying an appeal."[49]  The first two elements are plainly satisfied because this action involves several claims by Buyers that are in discovery as well as the two counterclaims brought by Sellers that have been finally decided for the reasons discussed above.  Thus, the only

---

[49] *In re Tri-Star Pictures, Inc., Litig.*, 1989 WL 112740, at *1 (Del. Ch. Sept. 26, 1989).

17

question is whether there is any just reason for delaying the time for taking an appeal on the counterclaims.

In making this determination, the court "may consider any factor relevant to judicial administrative interests or the equities of the case," keeping in mind that because of the general policy against piecemeal appeals "a Rule 54(b) order should not be entered unless the moving party can show some danger of hardship or injustice through delay which would be alleviated by immediate appeal."[50] In my view, it would be unjust to delay requiring Buyers to remit the tax refunds and insurance proceeds at issue until their claims have been finally adjudicated given the express provisions in the Agreement requiring prompt satisfaction of these obligations,[51] the substantial delay that already has occurred from when Buyers received those funds, and the reality that the remaining claims in this action present discrete issues that will not be fully adjudicated for some time.

In a similar case, which involved a contractual provision requiring a buyer to "promptly pay" pre-closing tax refunds to the sellers' representative, this court entered a final judgment under Rule 54(b), reasoning that "[i]t would be inappropriate to rewrite the unambiguous terms of the [agreement] to have it serve

---

[50] *Id.*

[51] Defs.' Opening Br., Ex. 1 § 6.7(e) (requiring tax refunds to be remitted "within fifteen (15) days of receipt or entitlement thereto"), § 6.8 (requiring insurance proceeds to be remitted "reasonably promptly after receipt").

18

[buyer's] current strategic interests in delaying payment of an obligation that is now owed."[52] The court further explained that the buyer "could have bargained for the right to delay payment of the tax refunds pending the resolution of its indemnification or other claims" but it did not do so.[53] The same reasoning applies here.

Importantly, this is not a case in which Buyers' claims that remain to be adjudicated are so interwoven with Sellers' counterclaims as to warrant delaying the entry of final judgment. Sellers' claims present discrete issues concerning specific tax refunds and insurance payments that are irrelevant to the ultimate resolution of Buyers' claims for fraud and breach of representations and warranties in the Agreement. Buyers' claims, furthermore, are currently the subject of discovery and no trial has been scheduled. Thus, apart from the delay Sellers already have suffered in awaiting the remittance of the tax refunds and insurance proceeds that they contractually were entitled to obtain promptly after they were paid to Buyers, Sellers would suffer considerable further delay if forced to await the final adjudication of the remaining claims in this case. Under these circumstances, entry of a final judgment under Rule 54(b) is appropriate.

---

[52] *FdG Logistics LLC v. A&R Logistics Hldgs., Inc.*, 131 A.3d 842, 866 (Del. Ch. 2016).

[53] *Id.*

19

## IV. CONCLUSION

For the reasons explained above, the Seller Representative's motion for judgment on the pleadings on its counterclaims will be granted and a final judgment will be entered under Rule 54(b). An implementing order accompanies this decision.

**IT IS SO ORDERED.**