2021 IL App (1st) 191937

No. 1-19-1937

Opinion filed March 30, 2021.

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| WALWORTH INVESTMENTS-LG, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2016 L 2470 |
| | ) | |
| MU SIGMA, INC., and DHIRAJ C. RAJARAM, | ) | The Honorable |
| | ) | John C. Griffin and Daniel J. |
| Defendants-Appellees. | ) | Kubasiak, |
| | ) | Judges Presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith concurred in the judgment and opinion.
Justice Pucinski specially concurred, with opinion.

**OPINION**

¶ 1    Walworth Investments-LG, LLC (plaintiff), a former stockholder, brought this action against Mu Sigma, Inc. (Mu Sigma), a privately held data analytics company, and Dhiraj C. Rajaram, the company's founder and chief executive officer (CEO) (collectively, defendants), alleging that they committed what is best described as a reverse "Madoff scheme" to induce plaintiff to sell its substantial ownership interest in the company.

¶ 2    The circuit court ultimately granted summary judgment to defendants on plaintiff's claims for fraudulent inducement, fraudulent concealment, negligent misrepresentation, and breach of fiduciary duty on the basis that they were precluded by antireliance language contained in the parties' written agreement. The circuit court then dismissed plaintiff's remaining claims for breach of contract and unjust enrichment, holding that they were barred by a general release provision found in the same agreement. In addition, the court held that plaintiff's unjust enrichment claim was not sustainable without the fraud claims on which it was based. For the reasons that follow, we reverse and remand for further proceedings.

¶ 3                                    BACKGROUND

¶ 4    The following facts were gleaned from the parties' pleadings, depositions, affidavits, and other supporting documents and were presented to the court below.

¶ 5    In 2005, Rajaram, as founder and CEO, incorporated Mu Sigma, a new data analytics company headquartered in Northbrook, Illinois. The next year, plaintiff, an investment company acting on a behalf of a prominent Chicago family, purchased over two million shares of series B preferred stock from Mu Sigma, totaling a 21% ownership stake in the company. According to plaintiff, this investment significantly aided Mu Sigma's growth over the next few years. For example, in December 2008, Mu Sigma generated gross revenues totaling nearly $14 million, which was more than 60 times the company's gross revenues of $219,000 generated the year before plaintiff invested. Additionally, Mu Sigma developed an elite clientele, which included companies like Dell, Microsoft, and Wal-Mart, among others. Meanwhile, plaintiff helped Mu Sigma secure another big investor.

¶ 6    In August 2008, Mu Sigma raised an additional $15 million through the sale of more than 8 million newly created shares of class C preferred stock for $1.72 per share. Mu Sigma also

repurchased some of Rajaram's stock shares for the same price. Around that time, plaintiff acquired over a million additional shares of series B preferred stock.

¶ 7     In October 2009, Mu Sigma made an unsolicited offer to its investors, including plaintiff, to repurchase up to 3 million shares of preferred stock for 67 cents per share. According to plaintiff, there was nothing in Mu Sigma's financial reports explaining the sudden, dramatic decrease in the company's stock value, which was less than half the price Mu Sigma paid to repurchase Rajaram's stock shares the year before. In any event, plaintiff declined the repurchase offer.

¶ 8     Nearly six months later, Rajaram approached plaintiff about repurchasing its stock shares. According to plaintiff, Rajaram said that Mu Sigma unfortunately would not be the "great success" they had hoped. Mu Sigma was losing its biggest customer, and the company's growth prospects had severely diminished. Consequently, Mu Sigma was unlikely to add new customers to offset its lost revenue. Instead, any future growth would be generated by purchasing other companies. Mu Sigma then offered to repurchase plaintiff's shares for $1.20 each. Plaintiff agreed to the proposal.

¶ 9     On May 27, 2010, the parties executed the stock repurchase agreement (SRA). Pursuant to that agreement, Mu Sigma purchased all of plaintiff's shares of series B preferred stock at $1.20 per share, for a total of $9,317,646.

¶ 10     A few months later, plaintiff learned that Rajaram had been interviewed by the Chicago Sun-Times newspaper. Contrary to what he told plaintiff, Rajaram told the Sun-Times that he predicted "huge growth" for Mu Sigma, estimating that the company would "double its revenues to $100 million *** in the next three years." When plaintiff confronted Rajaram about this

inconsistency, however, he had no explanation. And unfortunately for plaintiff, Mu Sigma's growth far exceeded Rajaram's prediction for it in the Sun-Times.

¶ 11    The reality was that Mu Sigma was thriving and experiencing incredible growth. Although Mu Sigma lost one customer, the company continued to experience rapid growth with existing clients, and it even attracted new clients, many of which were believed to be in the pipeline when Rajaram approached plaintiff about repurchasing its shares. And contrary to what Rajaram told plaintiff, Mu Sigma never purchased outside companies to generate growth. Instead, Mu Sigma grew organically, adding some of the world's largest and best-known companies as clients. By 2015, Mu Sigma was generating over $250 million in annual revenue and more than $125 million in annual cash profits.

¶ 12    In 2016, plaintiff filed the instant suit, asserting claims against defendants for fraudulent inducement, fraudulent concealment, and negligent misrepresentation. Plaintiff also asserted a claim against Rajaram for breach of fiduciary duty and claims against Mu Sigma for breach of contract and unjust enrichment.

¶ 13    Count I of plaintiff's first amended complaint alleged that defendants fraudulently induced plaintiff to sell its shares by knowingly making false statements about Mu Sigma's financial health and future prospects that they failed to correct. Counts II and III for fraudulent concealment and negligent misrepresentation alleged that defendants intentionally omitted and concealed material facts related to Mu Sigma's value, among other things, that Rajaram had a fiduciary duty to disclose in order to induce plaintiff to enter into the SRA. Count IV alleged that Mu Sigma was unjustly enriched as a result of its wrongdoing because it benefitted from the SRA to plaintiff's detriment. Count V alleged that Rajaram breached his fiduciary duty owed to plaintiff by failing to adequately disclose material information about Mu Sigma's value and

business prospects and by making false and misleading statements that induced plaintiff to enter into the SRA. Count VI alleged that Mu Sigma breached the SRA by falsely stating in the agreement that it was not engaged in any discussions or conversations with any third parties that could result in the sale or issuance of any capital stock in the company at an implied valuation or purchase price greater than the implied valuation of the stock repurchased from plaintiff. Last, count VII for punitive damages alleged that defendants' conduct was wilful and wanton.

¶ 14   Defendants moved to dismiss plaintiff's first amended complaint pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2014)), asserting, in the main, that plaintiff's claims were barred by the SRA because the agreement contained effective antireliance language and a general release provision. The circuit court granted defendants' motion in part, dismissing, without prejudice, the unjust enrichment and wilful and wanton misconduct counts (IV and VII) that were pleaded in the first amended complaint. The court, however, denied defendants' motion as to the remaining counts (I, II, III, V and VI), concluding that defendants did not meet their burden of showing the SRA contained clear, unambiguous antireliance language or that plaintiff was aware of their alleged misconduct when it signed the agreement. The circuit court subsequently denied defendants' motion to reconsider its ruling.

¶ 15   Meanwhile, defendants filed an answer to plaintiff's first amended complaint with a counterclaim for breach of contract, alleging that plaintiff breached the SRA by filing suit.

¶ 16   In December 2017, defendants moved for summary judgment on plaintiff's fraud and fiduciary duty claims (counts I, II, III and V) pursuant to section 2-1005 of the Code (735 ILCS 5/2-1005 (West 2016)), asserting that no genuine issue of material fact existed because the SRA contained effective antireliance language, Rajaram never owed plaintiff a fiduciary duty of disclosure, and fraudulent concealment was not a recognized cause of action in Illinois. The

circuit court disagreed, concluding that the language employed in the SRA did not amount to a clear and unambiguous disclaimer of reliance from plaintiff's point of view because it "only expressly refers to Mu Sigma's 'reliance' " and "does not have comparable language referring to [plaintiff]." This raised question of facts concerning the parties' intent and which party, if any, disclaimed reliance, precluding summary judgment. Additionally, the court noted that Illinois had repeatedly recognized a cause of action for fraudulent concealment. The circuit court, therefore, denied defendants' summary judgment motion on March 29, 2018.

¶ 17    We note that thus far, Judge John C. Griffin presided over the case in the circuit court. Shortly after denying defendants' summary judgment motion, however, Judge Griffin was appointed to the Illinois Appellate Court. The case was then assigned to Judge Daniel J. Kubasiak in the circuit court.

¶ 18    Once the case had been transferred to Judge Kubasiak, defendants filed a motion to reconsider Judge Griffin's ruling that was made more than 30 days earlier, denying their summary judgment motion. Even though defendants did not assert any new facts in their motion, Judge Kubasiak granted it, concluding that plaintiff's fraud-related claims were barred because the SRA contained a sufficient antireliance provision notwithstanding that it did "not expressly contain language as to [plaintiff's] 'non-reliance.' " Judge Kubasiak then granted summary judgment to defendants on those claims (counts I through III) but denied it as to plaintiff's unjust enrichment and breach of fiduciary duty claims (counts IV and V) on the basis that reliance was not an element of those causes of action.[1] The circuit court's ruling was entered on October 9, 2018.

---

[1]Plaintiff's unjust enrichment claim (count IV) was never the subject of defendants' summary judgment motion or their motion to reconsider, so it is unclear why the circuit court ruled on it.

¶ 19    Defendants subsequently filed a motion to reconsider the circuit court's ruling denying summary judgment on plaintiff's unjust enrichment and breach of fiduciary duty claims (counts IV and V). In their motion, defendants asserted that plaintiff's unjust enrichment claim had previously been dismissed by Judge Griffin (see *supra* ¶ 14) and that reliance was not an element of plaintiff's breach of fiduciary claim that was nevertheless barred the SRA's general release provision. The same day, plaintiff moved for leave to file a second amended complaint pursuant to section 2-616(a) of the Code (735 ILCS 5/2-616(a) (West 2016)), seeking to replead its unjust enrichment claim that had been dismissed, assert an additional breach of contract claim against Mu Sigma, and clarify that it was pursuing punitive damages as a remedy, not as a separate cause of action.

¶ 20    Following arguments from the parties, the circuit court granted defendants' motion to reconsider, concluding that plaintiff's breach of fiduciary claim was barred by the SRA because it required proof of reliance, contrary to what the court held earlier. The circuit court also granted plaintiff leave to amend its complaint on April 2, 2019.

¶ 21    Thereafter, plaintiff filed its second amended complaint, which contained six counts. Counts I through IV preserved plaintiff's claims for fraudulent inducement, fraudulent concealment, negligent misrepresentation, and breach of fiduciary duty that were previously dismissed on summary judgment. Count V alleged that Mu Sigma breached the investor rights agreement, which was a separate contract between plaintiff and Mu Sigma, by failing to provide the financial statements and reports requested by plaintiff and by intentionally concealing such financial information from March 2010 to May 2010. Count VI reasserted plaintiff's unjust enrichment claim but against both defendants this time.

¶ 22    Defendant moved to dismiss plaintiff's second amended complaint pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2018)), asserting that its claims for breach of contract and unjust enrichment were barred by the SRA's general release provision, and furthermore, that plaintiff failed to state a claim for unjust enrichment. The circuit court agreed and granted defendants' motion, dismissing plaintiff's second amended complaint with prejudice on August 30, 2019. The court's order stated, "[t]his is a final order disposing of the case in its entirety."

¶ 23    Plaintiff now appeals.

¶ 24                              ANALYSIS

¶ 25    On appeal, plaintiff contends that the circuit court erred in dismissing its claims against defendants because there was no clear, unambiguous antireliance provision in the SRA and, furthermore, the general release provision was unenforceable as a product of fraud.

¶ 26    Before proceeding to the merits, however, we must first address this court's jurisdiction. The record on appeal does not indicate that defendants' breach of contract counterclaim was ever resolved, nor does it contain a finding under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that was no just reason to delay either enforcement or appeal. Although this generally would deprive us of jurisdiction, it is apparent here that defendants abandoned their counterclaim by not engaging in any meaningful pursuit of it, by not objecting to the circuit court's August 30, 2019, order that disposed of the case in its entirety, and by not raising the issue on appeal. Accordingly, despite the lack of a formal resolution of defendants' counterclaim, we conclude that we have jurisdiction over this appeal. See *Cribbin v. City of Chicago*, 384 Ill. App. 3d 878, 886 (2008) ("When a party abandons a claim, and the trial court does not retain jurisdiction to

consider that claim when it enters judgment, that judgment may be considered final even if the abandoned claim is not explicitly mentioned in the judgment order.").

¶ 27    We also note the parties agree that Delaware law governs the issues on appeal related to the SRA's general release provision and alleged antireliance provision. Likewise, the parties agree that it makes no difference in the result whether Illinois or Delaware law governs the issues concerning plaintiff's unjust enrichment claim, but as they both focus almost exclusively on Illinois law, we will do the same.

¶ 28                                    I. Summary Judgment

¶ 29    Plaintiff first argues that the circuit court erroneously granted summary judgment to defendants on its fraudulent inducement, fraudulent concealment, negligent misrepresentation, and breach of fiduciary duty claims because the SRA did not effectively disclaim its reliance on Rajaram's alleged extra-contractual representations nor was reliance an element of its breach of fiduciary claim. Plaintiff further argues that, even if the SRA contained an effective disclaimer of reliance, it did not cover defendants' misconduct and should not be enforced in the context of a fiduciary relationship.

¶ 30    Summary judgment should not be granted unless the pleadings, depositions, and admissions on file, together with any affidavits, reveal no genuine issue of material fact such that the movants are entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2016); *Monson v. City of Danville*, 2018 IL 122486, ¶ 12. Simply put, if the record reveals a dispute as to any material issue of fact, summary judgment must be denied regardless of the lower court's belief that the movants will or should prevail at trial. *Ignarski v. Norbut*, 271 Ill. App. 3d 522, 525 (1995). "A genuine issue of material fact precluding summary judgment exists where the material facts are disputed, or, if the material facts are undisputed, reasonable persons might

draw different inferences from the undisputed facts." (Internal quotation marks omitted.) *Monson*, 2018 IL 122486, ¶ 12. Furthermore, courts must strictly construe the record against the movants. *Id.* We review the circuit court's summary judgment ruling *de novo*. *Id.*

¶ 31 The fundamental rules of contract interpretation are well settled. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). A court's primary objective in construing a contract is to ascertain and give effect to the parties' intentions as expressed through that contract's language. *Id.* If the contract's language is susceptible to more than one meaning, however, it is ambiguous. *Id.* Although a court determines whether or not a contract is ambiguous as a matter of law, the resolution of any ambiguity is a question of fact that must be decided by a jury. *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.*, 256 Ill. App. 3d 31, 34 (1993); see also *Pepper Construction Co. v. Transcontinental Insurance Co.*, 285 Ill. App. 3d 573, 576 (1996) (where the parties' contract was ambiguous, the circuit court erred in resolving the issue on summary judgment).

¶ 32 Like Illinois, "Delaware adheres to the objective theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party." (Internal quotation marks omitted.) *Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010). Moreover, under Delaware law, a contract must contain unambiguous antireliance language to "bar a contracting party from asserting claims for fraud based on representations outside the four corners of the agreement." *FdG Logistics LLC v. A&R. Logistics Holdings, Inc.*, 131 A.3d 842, 860 (Del. Ch. 2016). This requires that the language employed amount to a clear and unambiguous disclaimer from the aggrieved party's point of view that it did not rely on extracontractual statements in deciding to sign the contract. *Id.* In this regard, the distinction between a disclaimer of reliance from the point of view of parties accused of fraud and the point

of view of a counterparty who believes it has been defrauded "is critical *** because of the strong public policy against fraud." *Id.* "Because of that policy concern, we have not given effect to so-called merger or integration clauses that do not clearly state that the parties disclaim reliance upon extra-contractual statements." *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1058 (Del. Ch. Ct. 2006). Therefore, murky, unclear, or ambiguous provisions, as well as standard integration clauses without specific antireliance language, are not effective. *Id.* at 1059.

¶ 33    Here, the circuit court's ruling and the parties' respective arguments relied on three provisions in the SRA. First, the SRA contained a provision titled "Representations and Warranties of Stockholder" in section 3(e), which provided:

"(e) *Disclosure of Information.* Stockholder [plaintiff] has received all the information it considers necessary or appropriate for deciding whether to sell the Repurchased Stock to the Company [Mu Sigma] pursuant to this Agreement. Stockholder acknowledges (i) that neither the Company, nor any of the Company's Related Parties (as defined below), has made any representation or warranty, express or implied, except as set forth herein, regarding any aspect of the sale and purchase of the Repurchased Stock, the operation or financial condition of the Company or the value of the Repurchased Stock and (ii) that the Company is relying upon the truth of the representations and warranties in this Section 3 in connection with the purchase of the Repurchased Stock hereunder. For purposes of this Agreement, "Related Parties" shall mean current and former directors, officers, partners, employees, attorneys, agents, successors, assigns, current and former stockholders (including current and former limited partners, general

partners and management companies), owners, representatives, predecessors, parents, affiliates, associates and subsidiaries."

Next, the SRA contained a general release provision in section 5, which provided:

"*5. Release.* Stockholder hereby forever generally and completely releases and discharges the Company and its Related Parties and their respective successors and assigns from any and all claims, liabilities, obligations and demands of every kind and nature, in law, equity or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed, and in particular of and from all claims and demands of every kind and nature, known and unknown, suspected and unsuspected, disclosed and undisclosed, that arose out of or are in any way related to events, acts, conduct or omissions occurring prior to the date of this Agreement; provided, however, that the foregoing release shall not apply to claims relating to Stockholder's right to payment by the Company."

Third, the SRA contained a standard integration provision in section 6, which provided:

"(*g*) This Agreement contains the complete agreement and understanding between the parties as to the subject matter covered hereby and supersedes any prior understandings, agreements or representations by or between the parties, written or oral, which may have related to the subject matter hereof in any way."

¶ 34    In its October 9, 2018, order, the circuit court concluded that section 3(e) of the SRA, coupled with the general release in section 5, sufficiently disclaimed plaintiff's reliance on defendants' alleged representations or omissions made outside the four corners of the agreement. We disagree.

¶ 35    What is absent from that language is an unqualified disclaimer from plaintiff's point of view that it did not rely on the extra-contractual statements allegedly made by defendants. Rather, section 3(e) amounts to a disclaimer by defendants of what they were representing and relying upon: "Stockholder acknowledges *** (ii) that *the Company is relying upon* the truth of the representations and warranties in this Section 3 in connection with the purchase of the Repurchased Stock hereunder." (Emphasis added.) How would plaintiff know what defendants were relying on or whether or not they were relying on their own representations (or misrepresentations) contained in the agreement? Even if plaintiff did somehow know what defendants were relying on, it could not disclaim reliance for them. Thus, we conclude that the SRA's language was ambiguous as to which party, if any, disclaimed reliance, precluding summary judgment.

¶ 36    Furthermore, Judge Griffin concluded, like we have, that the SRA was ambiguous because the language employed in section 3(e) "only expressly refers to Mu Sigma's 'reliance' " and "does not have comparable language referring to [plaintiff]." Yet, Judge Kubasiak concluded that the same language sufficiently disclaimed plaintiff's reliance even though section 3(e) "does not expressly contain language as to [plaintiff's] 'non-reliance.' " The fact that two different judges reasonably interpreted the same contract language differently shows that the SRA was ambiguous. See *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity.").

¶ 37    Defendants here have conveniently ignored that these conflicting rulings refute their claim that the SRA contained an unambiguous antireliance provision. Instead, they argue that

*ChyronHego Corp. v. Wight*, No. 2017-0548-SG, 2018 WL 3642132, at \*1 (Del. Ch. Ct. 2018),

which was issued after Judge Griffin's ruling, supports their claim. It does not.

¶ 38    Initially, it should be noted that *ChyronHego* is an unpublished decision. Although an

unpublished decision is precedential under Delaware law, if *ChyronHego* had been filed in

Illinois, it could not be cited for this purpose. See Ill. S. Ct. R. 23(e) (eff. Jan. 1, 2021). To the

extent that an unpublished decision may be cited for precedential value, there are ample

Delaware published decisions that address the same issues found in *ChyronHego* that are more

appropriate. We will proceed to consider defendants' claim in light of the *ChyronHego* case, but

the parties would be wise to adhere to this court's procedural rules in the future.

¶ 39    In *ChyronHego*, the Delaware chancery court considered whether the parties' stock

purchase agreement contained an effective antireliance provision, emphasizing that a "contract

must contain language that, when read together, can be said to add up to a clear anti-reliance

clause by which the plaintiff has contractually promised that *it did not rely* upon statements

outside the contract's four corners in deciding to sign the contract." (Emphasis added.)

*ChyronHego Corp.*, 2018 WL 3642132, at \*4. The language in that agreement stated, in relevant

part, that:

> "Holdings and the Buyer agree that neither the Company, any Seller nor any of
>
> their respective Affiliates or advisors have made and shall not be deemed to have made
>
> any representation, warranty, covenant or agreement, express or implied, with respect to
>
> the Company, its business or the transactions contemplated by this Agreement, other than
>
> those representations, warranties, covenants and agreements explicitly set forth in this
>
> Agreement." *Id.* at \*5.

In concluding that language effectively disclaimed reliance, the court stated, as relevant here, that "[t]he first sentence is an explicit anti-reliance clause." *Id.* Notably, the language in that sentence stated both parties "agree" that no extracontractual representations or warranties were made.

¶ 40    Contrarily, here, there was no language in section 3(e) of the SRA stating that both plaintiff and Mu Sigma "agree" or "acknowledge" that no extra-contractual representations or warranties were made. Instead, section 3(e) separated them where it stated only that "Stockholder acknowledges ***" there were no extra-contractual representations or warranties made. Notably, there was no other language in the SRA from plaintiff's point of view that it disclaimed reliance on defendants' alleged misrepresentations, omissions and acts of concealment. We recognize that section 4(d) of the SRA provided that: "[Mu Sigma] acknowledges that [plaintiff] is relying upon the truth of the representations and warranties in this Section 4 in connection with the sale of the Repurchased Stock hereunder." But this potential reliance language is from Mu Sigma's point of view, not plaintiff's. See *FdG Logistics*, 131 A.3d at 860 ("The language to disclaim such reliance may vary ***, but the disclaimer must come from the point of view of the aggrieved party (or all parties to the contract) to ensure the preclusion of fraud claims for extra-contractual statements ***.").

¶ 41    Since we have determined that the SRA was ambiguous, we must consider the extrinsic evidence in this case. If a contract is "reasonably susceptible [to] two or more interpretations or may have two or more different meanings, then the contract is ambiguous and courts must resort to extrinsic evidence to determine the parties' contractual intent." (Internal quotation marks omitted.) *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 (Del. 2019); see also *Eagle Industries, Inc.*, 702 A.2d at 1232 (stating that "when there is

uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms"). This includes "evidence of prior agreements and communications of the parties." *Eagle Industries, Inc.*, 702 A.2d at 1233.

¶ 42     Here, plaintiff presented an earlier draft of section 3(e) of the SRA, containing antireliance language that was later removed at the request of plaintiff's counsel. That language stated in relevant part:

> "Stockholder acknowledges *** (ii) that Stockholder is not relying upon the Company or any of the Company's Related Parties in making its decision to sell the Repurchased Stock to the Company pursuant to this Agreement."

Had this language been included in the SRA, it almost certainly would have amounted to a clear disclaimer of reliance from plaintiff's point of view. But plaintiff specifically had it removed.

¶ 43     The prior draft of section 3(e) therefore certainly supports plaintiff's claim that it never intended to disclaim reliance on defendants' alleged extra-contractual statements and is evidence that may show there was not an effective antireliance provision in the SRA. These are questions, however, for the jury to decide.

¶ 44     Plaintiff also presented internal e-mails between Rajaram and Narayana Swamy (Swamy), an executive officer for Mu Sigma, in which Rajaram effectively admitted that he engaged in a soft "con job" to obtain plaintiff's assent to the SRA.[2] On the same day that the repurchase transaction closed (*i.e.*, May 27, 2010), Rajaram forwarded Swamy an e-mail that he

---

[2]It should be noted that at oral argument before this court, defense counsel rather glibly argued about how much money plaintiff made by selling its stock shares back to Mu Sigma but failed to mention that plaintiff is claiming to have been defrauded in excess of "hundreds of millions of dollars" in damages, a far cry from the approximately "9.3 million dollars" that defense counsel thought plaintiff should have been satisfied with.

had previously sent plaintiff offering to repurchase its stock shares due to Mu Sigma's supposed

negative prospects, and stated:

> "I am very proud of this email…I thought I [would] send [it] to you…Most people
>
> [would] not appreciate the challenge in dealing with a tough investor."

The next day, Swamy e-mailed Rajaram, stating:

> "It [was] a brilliant [e-]mail. You tempted [plaintiff] enough without trying to oversell.
>
> That's probably the reason it worked."

¶ 45     These e-mails are relevant to show whether or not plaintiff was aware of defendants'

alleged misconduct when it signed the SRA, which defendants have claimed it was, and to

determine whether the SRA was enforceable if it was fraudulently procured. These too are

questions for the jury to decide.

¶ 46     Defendants, nevertheless, argue that plaintiff cannot avoid the SRA's effect by alleging

claims simply based on omissions or acts of concealment, rather than extra-contractual

statements. In support, defendants cite a number of cases that have rejected parties' attempts that

relied on omissions to avoid otherwise effective antireliance provisions in their contracts. See

*Universal American Corp. v. Partners Healthcare Solutions Holdings, L.P.*, 176 F. Supp. 3d 387,

401 (D. Del. 2016); *MidCap Funding X Trust v. Graebel Cos.*, No. 2018-0312-MTZ, 2020 WL

2095899, *21 (Del. Ch. 2020); *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35,

51-53 (Del. Ch. 2015). We find these cases to be distinguishable from the present case for two

reasons.

¶ 47     First, the antireliance language in those cases specifically identified what information the

parties relied on in entering into their respective contracts. See *Universal American*, 176 F. Supp.

3d at 401 (the parties' contract provided that "[n]either parent nor the merger sub is relying or

has relied on any representations and warranties except for those expressly made by the company in this Article 3" (emphasis omitted and capitalization adjusted); *MidCap Funding*, 2020 WL 2095899, *19 (the parties' contract provided that each party agreed that "it is not entering into this Agreement in reliance upon any representations, promises or assurances other than those expressly set forth in this Agreement"); *Prairie Capital*, 132 A.3d at 50 (the parties' contract provided that, "[i]n making its determination to proceed with the Transaction, the Buyer has relied on (a) the results of its own independent investigation and (b) the representations and warranties of the Double E Parties expressly and specifically set forth in this Agreement, including the Schedules. SUCH REPRESENTATIONS AND WARRANTIES BY THE DOUBLE E PARTIES CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE DOUBLE E PARTIES TO THE BUYER IN CONNECTION WITH THE TRANSACTION"). The courts in these cases concluded that, because the parties' contracts specifically limited the scope of information on which the parties had relied, any attempt to go beyond those limits by referring to misrepresentations as "omissions" would not be permitted. See *Universal American*, 176 F. Supp. 3d at 403; *MidCap Funding*, 2020 WL 2095899, *21; *Prairie Capital*, 132 A.3d at 54-55.

¶ 48     In contrast, here, there is no language in the SRA that specifically identified what information plaintiff did or did not rely on in entering into the SRA. Although the SRA stated that defendants made no extra-contractual statements "regarding any aspect of the sale and purchase of theRepurchased Stock, the operation or financial condition of the Company or the value of the Repurchased Stock," this does not sufficiently define what information plaintiff relied or did not rely on when it signed the agreement. Regardless, that language does not

amount to a clear disclaimer of reliance from plaintiff's point of view, as mentioned above (see *supra* ¶ 35).

¶ 49    Second, the cases cited by defendants involved arms-length transactions where there was no affirmative duty of disclosure. In Delaware, fraud may occur in three ways: (1) an overt misrepresentation, (2) silence or an omission in the face of a duty to speak, or (3) deliberate concealment of material facts. *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1074 (Del. 1983). "Thus, one is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading." *Id.*

¶ 50    Plaintiff claims that Rajaram had an affirmative duty to speak based on his fiduciary duty to disclose all information that was material to the stock repurchase transaction. Defendants dispute that Rajaram owed plaintiff any such fiduciary duty.

¶ 51    Where directors communicate with stockholders in connection with a request for stockholder action, they "must disclose fully and fairly all material facts within their control bearing on the request." *Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020). This is known as the director's "fiduciary duty of disclosure" and is a specific application of the more general duties of due care and loyalty. *Id.* A breach of the fiduciary duty of disclosure occurs when the alleged omission or misrepresentation is material. *Id.* Whether the duty of disclosure is triggered, however, depends entirely on whether a request for shareholder action was made. "In the absence of a request for stockholder action, the Delaware General Corporation Law does not require directors to provide shareholders with information concerning the finances or affairs of the corporation." *Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998). Recently, in *Dohmen*, the Delaware Supreme Court clarified that a request for an individual stockholder to enter into a purchase or

sale agreement does not qualify as a request for stockholder action to which the fiduciary duty of disclosure applies. *Dohmen*, 234 A.3d at 1171.

¶ 52    Additionally, when a director breaches the duty of disclosure, his liability is considered "*per se*." *Id.* at 1168. This means that when a director requests stockholder action but fails to disclose material facts bearing on that request, the beneficiary stockholder need not demonstrate any other elements of proof, *i.e.*, reliance, causation, or damages, to succeed on a claim for breach of fiduciary duty. *Id.* This *per se* rule, however, applies only to nominal damages, not compensatory damages. *Id.* To recover compensatory damages for a breach of the fiduciary duty of disclosure, a stockholder must prove reliance, causation, and damages. *Id.* at 1175.

¶ 53    The parties here do not dispute that the duty of disclosure applies only to communications related to a request for stockholder action, nor do they dispute that individual stockholder transactions do not qualify as requests for stockholder action. They do, however, disagree on whether Mu Sigma's repurchase of plaintiff's stock constituted an individual stockholder transaction or a request for stockholder action.

¶ 54    The circuit court in this case concluded that the repurchase constituted an individual stockholder transaction, pointing out that plaintiff and Mu Sigma were the only parties to the SRA and that plaintiff acknowledged in its pleadings that individualized negotiations took place under the SRA's terms. In addition, plaintiff's claims in the first amended complaint were based on Rajaram's individual communications with plaintiff, not with a large group of stockholders. These facts, however, do not conclusively establish that Mu Sigma's repurchase of plaintiff's stock shares was an individual stockholder transaction. Moreover, plaintiff presented evidence that defendants intended to extend their repurchase offer to an unspecified number of other stockholders. Although this is not the equivalent of a request for stockholder action, it certainly

raises a question of fact as to whether the repurchase was an individual transaction or part of a larger request for stockholder action. If it was part of a larger request for stockholder action, such that Rajaram had a fiduciary duty of disclosure, then any claim for breach of that duty does not require proof of plaintiff's reliance. In turn, if reliance was not a necessary element of plaintiff's claim for breach of fiduciary duty, then the question of whether the SRA contained an effective antireliance provision had no bearing on the success or failure of that claim. See *id.* at 1168.

¶ 55    Because we have concluded that there is a genuine issue of material fact regarding whether the repurchase transaction was part of a request for stockholder action, there is necessarily a genuine issue of material fact as to whether Rajaram owed plaintiff a fiduciary duty to disclose all material information related to that transaction. If he did owe such a duty, then his failure to disclose that information, as well as his active concealment of material information, may certainly form the basis of plaintiff's fraud-related claims.

¶ 56    Based on the foregoing, we conclude that there were genuine issues of material fact, precluding summary judgment on plaintiff's fraudulent inducement, fraudulent concealment, negligent misrepresentation and breach of a fiduciary duty claims. The circuit court therefore improperly entered summary judgment in favor of defendants on those claims.

¶ 57                                      II. Motion to Dismiss

¶ 58    We also conclude that the circuit court erred in granting defendants' motion to dismiss plaintiff's claims for breach of contract and unjust enrichment based on the SRA's general release provision.

¶ 59    Section 2-619.1 of the Code allows the movants to combine a section 2-615 motion to dismiss (735 ILCS 5/2-615 (West 2018)) with a section 2-619 motion to dismiss (735 ILCS 5/2-619) (West 2018)). *In re Application of the County Treasurer*, 2012 IL App (1st) 101976, ¶ 28.

A section 2-615 motion attacks the legal sufficiency of the nonmovant's claim, whereas a section 2-619 motion admits the legal sufficiency of its claim but asserts affirmative defenses or other matters that avoid or defeat it. *Gatreaux v. DKW Enterprises, LLC*, 2011 IL App (1st) 103482, ¶ 10. We review the lower court's judgment on a section 2-619.1 motion *de novo*, and we may affirm the court's judgment on any basis in the record, regardless of whether the court relied on that basis or whether its reasoning was correct. *Id.* Furthermore, we "must consider whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law." *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116-17 (1993).

¶ 60                    A. General Release Provision

¶ 61    Plaintiff argues that the general release was not enforceable against its breach of contract and unjust enrichment claims because Rajaram breached his fiduciary duty of disclosure by not disclosing his wrongdoings to plaintiff before it entered into the SRA. Plaintiff also argues that the release was unenforceable because it was a product of fraud.

¶ 62    In Delaware, a court may "set aside a clear and unambiguous release where there is fraud." *Alvarez v. Castellon*, 55 A.3d 352, 354 (Del. 2012). Where, as here, the plaintiff "asserts that the release itself was induced" by the defendants' fraud, the parties seeking enforcement of that release bear "the burden of proving that the released fraud claim was within the contemplation of the releasing party." (Internal quotation marks omitted.) *Seven Investments, LLC v. AD Capital, LLC*, 32 A.3d 391, 396 (Del. Ch. Ct. 2011).

¶ 63    The central theme of plaintiff's case against defendants is that they fraudulently induced it to enter into the SRA, which contains the general release provision. If plaintiff proves that defendant procured the SRA through fraud, however, then the entire agreement, including the

general release provision, presumably would be unenforceable. See *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust*, 28 A.3d 1059, 1067 (Del. 2011) (where there is fraud in the inducement to enter into a contract, the contract is "voidable" at the election of the innocent party).

¶ 64    Defendants' response to plaintiff's argument that the release is unenforceable as a product of fraud is twofold. First, defendants cite to a number of cases addressing when a fraud claim is released under the terms of a general release provision. These cases are inapplicable, however, because the question is not whether plaintiff's fraud claims are barred by the release, but whether the release itself was procured by fraud. Second, defendants argue that the purported antireliance provision in the SRA defeats the reliance element of plaintiff's fraudulent inducement claim. But as we have already concluded, there are genuine issues of material fact regarding whether the SRA even contained effective antireliance language, let alone which party, if any, disclaimed reliance. Because the enforceability of the general release provision depends on whether plaintiff's fraud claims are successful, the dismissal of plaintiff's breach of contract and unjust enrichment claims based on that provision was premature.

¶ 65                                    B. Unjust Enrichment

¶ 66    Alternatively, the circuit court dismissed plaintiff's unjust enrichment claim because the parties' relationship was governed by a contract. This too was error.

¶ 67    Where, as here, an unjust enrichment claim is based on a tort theory that the plaintiff was fraudulently induced to enter into a written agreement, it is not barred by the existence of a contract between the parties. See, *e.g.*, *Peddinghaus v. Peddinghaus*, 295 Ill. App. 3d 943, 949 (1998) ("In the present case, plaintiff bases his unjust enrichment claim on a tort theory, specifically, that defendants, through their agent ***, fraudulently induced him to sell his shares

in the *** trust. Since plaintiff's unjust enrichment claim is based on tort, instead of quasi-contract, the existence of a specific contract does not defeat his cause of action."). Here, plaintiff's unjust enrichment claim was based on defendants' allegedly fraudulent conduct that induced it to enter into the SRA. Accordingly, we conclude that the existence of the SRA did not preclude plaintiff from pursuing its unjust enrichment claim.

¶ 68       In sum, we conclude that the circuit court erred in granting defendants' section 2-619.1 motion to dismiss plaintiff's breach of contract and unjust enrichment claims. Accordingly, we reverse the circuit court's judgment dismissing those claims.

¶ 69                                    CONCLUSION

¶ 70       For the foregoing reasons, we reverse the circuit court's summary judgment ruling in favor of defendants on plaintiff's fraudulent inducement, fraudulent concealment, negligent misrepresentation, and breach of fiduciary duty claims and remand for further proceedings. In addition, we reverse the circuit court's judgment dismissing plaintiff's breach of contract and unjust enrichment claims and remand for further proceedings.

¶ 71       Reversed and remanded.

¶ 72       JUSTICE PUCINSKI, specially concurring:

¶ 73       While I agree that the trial court erred in granting summary judgment in favor of defendants on plaintiff's claims of fraudulent inducement, fraudulent concealment, negligent misrepresentation, and breach of fiduciary duty because the contract at issue is ambiguous, and I agree that the trial court also erred in dismissing plaintiff's claims of breach of contract and unjust enrichment where there are genuine issues of material fact as to whether the claims are barred by the general release in the contract, I feel that the opinion prepared by the majority unnecessarily goes too far into the trier of fact's realm when discussing the parole evidence.

¶ 74    First, I do not agree that two trial judges coming to different conclusions about the contract automatically means the contract is ambiguous. One of the judges could just be wrong. Second, having found that the contract is ambiguous for other reasons, I do not believe it is up to us as the reviewing court to go much farther. We should just remand and let the jury do the fact finding about what the contract actually means. The majority has delved too far into the extra contractual communications and drafting of the contract without giving the jury the chance to decide what is fact, what is true, and what is not.

¶ 75    Third, I see several questions of material fact that would preclude summary judgment on some issues and dismissal of others:

        (1) does the SRA contain an effective antireliance provision applicable to some or all of Walworth's allegations?

        (2) does section 3 (e) of the SRA clearly encompass all of Walworth's allegations?

        (3) did Walworth effectively disclaim its reliance on Mu Sigma and Rajaram's alleged misrepresentations, omissions and acts of concealment?

        (4) was the stock repurchase by Walworth an individual stockholder transaction or a shareholder transaction?

        (5) did Rajaram have an affirmative fiduciary duty to disclose all information relative to the stock repurchase transaction?

        (6) was the general release in the contract procured by fraud?

¶ 76    Any one of these questions should prevent summary judgment or dismissal. All of them taken together clearly require remand to the circuit court.

**No. 1-19-1937**

| **Cite as:** | *Walworth Investments-LG, LLC v. Mu Sigma, Inc.*, 2021 IL App (1st) 191937 |
| --- | --- |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2016-L-2470; the Hon. John C. Griffin and the Hon. Daniel J. Kubasiak, Judges, presiding. |
| **Attorneys for Appellant:** | Stephen P. Barry, of Clifford Law Offices, of Chicago, for appellant. |
| **Attorneys for Appellee:** | James R. Figliulo and Peter A. Silverman, of Figliulo & Silverman PC, of Chicago, for appellees. |